# MICHIGAN *v.* SUMMERS

No. 79–1794.   Argued February 25, 1981—Decided June 22, 1981

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 706.

*Timothy A. Baughman* argued the cause for petitioner. With him on the brief was *William L. Cahalan.*

*Gerald M. Lorence* argued the cause and filed a brief for respondent.

*Elliott Schulder* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were

Solicitor General *McCree,* Assistant Attorney General *Heymann,* and Deputy Solicitor General *Frey.*

*Bruce J. Ennis, Jr.,* argued the cause for the American Civil Liberties Union as *amicus curiae* urging affirmance. With him on the brief was *Lawrence Herman.**

JUSTICE STEVENS delivered the opinion of the Court.

As Detroit police officers were about to execute a warrant to search a house for narcotics, they encountered respondent descending the front steps. They requested his assistance in gaining entry and detained him while they searched the premises. After finding narcotics in the basement and ascertaining that respondent owned the house, the police arrested him, searched his person, and found in his coat pocket an envelope containing 8.5 grams of heroin.[1]

---

*\*David Crump* and *Michael C. Kuhn* filed a brief for John B. Holmes, Jr., et al. as *amici curiae* urging reversal.

[1] The execution of the warrant is described in greater detail in Justice Moody's opinion for the Michigan Supreme Court:

"Upon arriving at the named address, Officer Roger Lehman saw the defendant go out the front door of the house and proceed across the porch and down the steps. When defendant was asked to open the door he replied that he could not because he left his keys inside, but he could ring someone over the intercom. Dwight Calhoun came to the door, but did not admit the police officers. As a result, the officers obtained entrance to the premises by forcing open the front door. Once admittance had been gained Officer Lehman instructed Officer Conant, previously stationed along the side of the house, to bring the defendant, still on the porch, into the house.

"After the eight occupants of the house were detained, a search of the premises revealed two plastic bags of suspected narcotics under the bar in the basement. After finding the suspected narcotics in the basement and upon determining that the defendant was the owner of the house, Officer Conant formally arrested the defendant for violation of the Controlled Substances Act of 1971. MCL 335.341 (4) (a); MSA 18.1070 (41) (4) (a). A custodial search conducted by Officer Conant revealed a plastic bag containing suspected heroin in the defendant's jacket pocket. It is this heroin, discovered on the person of the defendant, that forms the basis

Respondent was charged with possession of the heroin found on his person. He moved to suppress the heroin as the product of an illegal search in violation of the Fourth Amendment,[2] and the trial judge granted the motion and quashed the information. That order was affirmed by a divided panel of the Michigan Court of Appeals, 68 Mich. App. 571, 243 N. W. 2d 689, and by the Michigan Supreme Court over the dissent of three of its justices. 407 Mich. 432, 286 N. W. 2d 226. We granted the State's petition for certiorari, 449 U. S. 898, and now reverse.

I

The dispositive question in this case is whether the initial detention of respondent violated his constitutional right to be secure against an unreasonable seizure of his person. The State attempts to justify the eventual search of respondent's person by arguing that the authority to search premises granted by the warrant implicitly included the authority to search persons on those premises, just as that authority included an authorization to search furniture and containers in which the particular things described might be concealed. But as the Michigan Court of Appeals correctly noted, even if otherwise acceptable, this argument could not justify the initial detention of respondent outside the premises described in the warrant. See 68 Mich. App., at 578–580, 243 N. W.

---

of the instant possession charge." 407 Mich. 432, 441, 286 N. W. 2d 226, 226–227.

[2] The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourteenth Amendment requires the several States to secure these rights. See *Payton* v. *New York*, 445 U. S. 573, 576; *Dunaway* v. *New York*, 442 U. S. 200, 207.

2d, at 692–693. If that detention was permissible, there is no need to reach the question whether a search warrant for premises includes the right to search persons found there, because when the police searched respondent, they had probable cause to arrest him and had done so.[3] Our appraisal of the validity of the search of respondent's person therefore depends upon a determination whether the officers had the authority to require him to re-enter the house and to remain there while they conducted their search.[4]

---

[3] Because there were several other occupants of the house, under Michigan law the evidence that narcotics had been found in the basement of respondent's house would apparently be insufficient to support a conviction. See *People* v. *Davenport*, 39 Mich. App. 252, 197 N. W. 2d 521 (1972). The Michigan Court of Appeals relied on *Davenport* to conclude that the officers did not have probable cause to arrest or search respondent even though he was the owner of a house in which contraband was found. 68 Mich. App., at 580–582, 243 N. W. 2d, at 692–693. Judge Bashara, dissenting in the Court of Appeals, *id.*, at 585, 243 N. W. 2d, at 695, and the three dissenting justices of the Michigan Supreme Court, 407 Mich., at 450, 463–464, 286 N. W. 2d, at 231, 237, pointed out that *Davenport*, which concerns the proof necessary to support a conviction, is not dispositive of the question whether the police had probable cause to arrest. See *Brinegar* v. *United States*, 338 U. S. 160, 174–176. Regardless of whether the police had probable cause to arrest respondent under Michigan law, probable cause within the meaning of the Fourth Amendment is not at issue here. Respondent does not challenge the conclusion that the evidence found in his home established probable cause to arrest him. See Brief for Respondent 17.

[4] The "seizure" issue in this case should not be confused with the "search" issue presented in *Ybarra* v. *Illinois*, 444 U. S. 85. In *Ybarra* the police executing a search warrant for a public tavern detained and searched all of the customers who happened to be present. No question concerning the legitimacy of the detention was raised. Rather, the Court concluded that the search of Ybarra was invalid because the police had no reason to believe he had any special connection with the premises, and the police had no other basis for suspecting that he was armed or in possession of contraband. See *id.*, at 90–93. In this case, only the detention is at issue. The police knew respondent lived in the house, and

## II

In assessing the validity of respondent's initial detention, we note first that it constituted a "seizure" within the meaning of the Fourth Amendment.[5] The State does not contend otherwise, and the record demonstrates that respondent was not free to leave the premises while the officers were searching his home. It is also clear that respondent was not formally arrested until after the search was completed. The dispute therefore involves only the constitutionality of a pre-arrest "seizure" which we assume was unsupported by probable cause.

In *Dunaway* v. *New York,* 442 U. S. 200, the Court reaffirmed the general rule that an official seizure of the person must be supported by probable cause, even if no formal arrest is made. In that case police officers located a murder suspect at a neighbor's house, took him into custody, and transported him to the police station, where interrogation ultimately produced a confession. Because the suspect was not arrested until after he had confessed, and because he presumably would have been set free if probable cause had not been established during his questioning, the State argued that the pre-arrest detention should not be equated with an arrest and should be upheld as "reasonable" in view of the serious character of the crime and the fact that the police had an articulable basis for suspecting that Dunaway was involved. *Id.,* at 207. The Court firmly rejected the State's argument, noting that "the detention of petitioner was in

---

they did not search him until after they had probable cause to arrest and had done so.

[5] "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry* v. *Ohio,* 392 U. S. 1, 16.

important respects indistinguishable from a traditional arrest." *Id.*, at 212.[6]   We stated:

> "Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause.
>
> "The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. 'The requirement of probable cause has roots that are deep in our history.' *Henry* v. *United States*, 361 U. S. 98, 100 (1959).   Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' *Id.*, at 101 (footnotes omitted).   The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule.   See *Brinegar* v. *United States*, [338 U. S., at 175–176]." *Id.*, at 213.

Although we refused in *Dunaway* to find an exception that would swallow the general rule, our opinion recognized that some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment.   In these cases the intru-

---

[6] The Court noted that Dunaway was "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room."   He was not informed that he was free to leave; he would not have been free to leave and would have been physically restrained had he attempted to do so.   442 U. S., at 212.

sion on the citizen's privacy "was so much less severe" than that involved in a traditional arrest that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable. *Id.,* at 209.

In the first such case, *Terry* v. *Ohio,* 392 U. S. 1, the Court recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause. The Court approved a "frisk" for weapons as a justifiable response to an officer's reasonable belief that he was dealing with a possibly armed and dangerous suspect.[7] In the second such case, *Adams* v. *Williams,* 407 U. S. 143, the Court relied on *Terry* to hold that an officer could forcibly stop a suspect to investigate an informant's tip that the suspect was armed and carrying narcotics.[8] And in *United States* v. *Brignoni-Ponce,* 422 U. S. 873, the Court held that the special enforcement problems confronted by roving Border Patrol agents, though not sufficient to justify random stops of vehi-

---

[7] In upholding the "frisk" employed by the officer in that case, the Court assumed, without explicitly stating, that the Fourth Amendment does not prohibit forcible stops when the officer has a reasonable suspicion that a crime has been or is being committed. See 392 U. S., at 32–33 (Harlan, J., concurring); *id.,* at 34 (WHITE, J., concurring). In *Adams* v. *Williams,* 407 U. S., at 146, the Court made explicit what was implicit in *Terry:*

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

See also *United States* v. *Brignoni-Ponce,* 422 U. S. 873; *United States* v. *Cortez,* 449 U. S. 411.

[8] The Court noted that the informant's tip was insufficient to justify an arrest or search based on probable cause under *Spinelli* v. *United States,* 393 U. S. 410, and *Aguilar* v. *Texas,* 378 U. S. 108, but the information "carried enough indicia of reliability to justify the officer's forcible stop of Williams." 407 U. S., at 147.

cles near the Mexican border to question their occupants about their citizenship, *id.*, at 882–884,[9] were adequate to support vehicle stops based on the agents' awareness of specific articulable facts indicating that the vehicle contained illegal aliens. The Court reasoned that the difficulty in patrolling the long Mexican border and the interest in controlling the influx of illegal aliens justified the limited intrusion, usually lasting no more than a minute, involved in the stop. *Id.*, at 878–880.[10] See also *United States* v. *Cortez,* 449 U. S. 411.

These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. In these cases, as in *Dunaway,* the Court was applying the ultimate standard of reasonableness embodied in the

---

[9] In several cases, the Court has concluded that the absence of any articulable facts available to the officer rendered a detention unreasonable. In *Delaware* v. *Prouse,* 440 U. S. 648, 663, the Court held that police could not make random stops of vehicles in order to check drivers' licenses and vehicle registrations in the absence of "articulable and reasonable suspicion" that the motorist was unlicensed or the car unregistered. In *Brown* v. *Texas,* 443 U. S. 47, we held that a statute requiring individuals to identify themselves was unconstitutional as applied because the police did not have any reasonable suspicion that the petitioner had committed or was committing a crime. Finally, in *Ybarra* v. *Illinois,* 444 U. S. 85, we held that police executing a search warrant at a tavern could not invoke *Terry* to frisk a patron unless the officers had individualized suspicion that the patron might be armed or dangerous.

[10] The detention approved in *Brignoni-Ponce* did not encompass a search of the vehicle. The Court had held in *Almeida-Sanchez* v. *United States,* 413 U. S. 266, that such a search must be supported by probable cause. In *United States* v. *Martinez-Fuerte,* 428 U. S. 543, the Court held that stops at permanent checkpoints involved even less intrusion to a motorist than the detention by the roving patrol, and thus a stop at such a checkpoint need not even be based on any individualized suspicion.

Fourth Amendment.[11]  They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.  But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*.[12]  Therefore, in

[11] In his opinion for the Court in *Terry*, Chief Justice Warren identified "the central inquiry under the Fourth Amendment" as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." 392 U. S., at 19.  Before analyzing the specific stop and frisk involved in that case, he stated:

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.  And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?  Cf. *Carroll* v. *United States*, 267 U. S. 132 (1925); *Beck* v. *Ohio*, 379 U. S. 89, 96–97 (1964)." *Id.*, at 21–22 (footnotes omitted).

[12] JUSTICE WHITE, concurring in *Dunaway*, noted that *Terry* is not "an almost unique exception to a hard-and-fast standard of probable cause."  Rather, "the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests." 442 U. S., at 219.  If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams*.  As one commentator observed:

"It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop.  The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained.  Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted.  Or, the suspect may be detained while it is determined if in fact

order to decide whether this case is controlled by the general rule, it is necessary to examine both the character of the official intrusion and its justification.

## III

Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.[13] Indeed, we may safely assume that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention.[14]

an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale." 3 W. LaFave, Search and Seizure § 9.2, pp. 36–37 (1978).

[13] "As the Court reiterated just a few years ago, the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' *United States* v. *United States District Court,* 407 U. S. 297, 313. And we have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort." *Payton* v. *New York,* 445 U. S., at 585–586.

[14] Professor LaFave has noted that the reasonableness of a detention may be determined in part by "whether the police are diligently pur-

Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.[15]  In sharp contrast to the custodial interrogation in *Dunaway*, the detention of this respondent was "substantially less intrusive" than an arrest. 442 U. S., at 210.[16]

In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant.  Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.  Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers.  Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.[17]  The risk of harm to both the

suing a means of investigation which is likely to resolve the matter one way or another very soon . . . ."  3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978).

[15] Moreover, unlike the seizure in *Dunaway*, which was designed to provide an opportunity for interrogation and did lead to Dunaway's confession, the seizure in this case is not likely to have coercive aspects likely to induce self-incrimination.

[16] We do not view the fact that respondent was leaving his house when the officers arrived to be of constitutional significance.  The seizure of respondent on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside.

[17] The fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant.  No such question, however, is presented by this case.

police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Cf. 2 W. LaFave, Search and Seizure § 4.9, pp. 150–151 (1978). Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home.[18] The connection of an occupant to that home

---

[18] Justice Jackson recognized the significance of this determination in *Johnson* v. *United States*, 333 U. S. 10, 13–14:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern

gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

In *Payton* v. *New York,* 445 U. S. 573, we held that police officers may not enter a private residence to make a routine felony arrest without first obtaining a warrant. In that case we rejected the suggestion that only a search warrant could adequately protect the privacy interests at stake, noting that the distinction between a search warrant and an arrest warrant was far less significant than the interposition of the magistrate's determination of probable cause between the zealous officer and the citizen:

> "It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.,* at 602–603.

That holding is relevant today. If the evidence that a citizen's residence is harboring contraband is sufficient to per-

---

to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (Footnotes omitted.)

suade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.[19] Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband[20] founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.[21]

Because it was lawful to require respondent to re-enter and to remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible. The judg-

---

[19] In refusing to approve seizures based on less than probable cause, the *Dunaway* Court declined to adopt a "multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests." The Court noted:

"[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.'" 442 U. S., at 213.

As JUSTICE WHITE noted in his concurrence in *Dunaway*, if police are to have workable rules, the balancing of the competing interests inherent in the *Terry* principle "must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers." 442 U. S., at 219–220. The rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.

[20] We do not decide whether the same result would be justified if the search warrant merely authorized a search for evidence. Cf. *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 560. See also *id.*, at 581 (STEVENS, J., dissenting).

[21] Although special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case.

ment of the Supreme Court of Michigan must therefore be reversed.

*It is so ordered.*

JUSTICE STEWART, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court is correct in stating that "some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment." *Ante,* at 697. But to escalate this statement into some kind of a general rule is to ignore the protections that the Fourth Amendment guarantees to us all. There are only two types of seizures that need not be based on probable cause. The first, represented by the *Terry* line of cases, is a limited stop to question a person and to perform a patdown for weapons when the police have reason to believe that he is armed and dangerous. *E. g., Terry* v. *Ohio,* 392 U. S. 1, 23–24. The second is a brief stop of vehicles near our international borders to question occupants of the vehicles about their citizenship. *E. g., United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881.

From these two special exceptions to the general prohibition on seizures not based on probable cause, the Court leaps to the very broad idea that courts may approve a wide variety of seizures not based on probable cause, so long as the courts find, after balancing the law enforcement purposes of the police conduct against the severity of their intrusion, that the seizure appears "reasonable." *Ante,* at 700–701, and nn. 11, 12. But those two lines of cases do not represent some sort of exemplary balancing test for Fourth Amendment cases. Rather, they represent two isolated exceptions to the general rule that the Fourth Amendment itself has already performed the constitutional balance between police objectives and personal privacy. The seizure permitted by the Court today, the detention of a person at his home while the police execute a search warrant for contraband inside it, is categorically

different from those two special exceptions to the warrant and probable-cause requirement, and poses a significantly greater threat to the protections guaranteed by the Constitution.

## I

The common denominator of the *Terry* cases and the border checkpoint cases is the presence of some governmental interest independent of the ordinary interest in investigating crime and apprehending suspects, an interest important enough to overcome the presumptive constitutional restraints on police conduct. At issue in *Terry* was "more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry* v. *Ohio*, 392 U. S., at 23. Though the officer in *Terry* was engaged in investigating crime, the governmental purpose that justified the stop and patdown was not the investigation itself, but "the neutralization of danger to the policeman in the investigative circumstance." *Id.*, at 26. Stating its essential holding, the Court said: "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.*, at 24.

Similarly, in *Adams* v. *Williams*, 407 U. S. 143, the officer had received an informant's tip, not amounting to probable cause, that Williams was carrying narcotics and a gun. The Court held that the officer acted legally in reaching into the car and intruding on Williams' person to see if Williams indeed was in possession of a lethal weapon. In so holding, the Court made clear that what justified this intrusion on Williams' person was not the possibility of finding contraband

narcotics, but rather the officer's need to protect himself from harm by seizing the suspected gun: "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Id.,* at 146; accord, *Pennsylvania* v. *Mimms,* 434 U. S. 106, 110. See *Ybarra* v. *Illinois,* 444 U. S. 85, 93.

In *United States* v. *Brignoni-Ponce, supra,* the Court approved a limited stop of vehicles by patrols of immigration officers near the Mexican border, but in doing so it stressed the unique governmental interest in preventing the illegal entry of aliens. The Court held that brief stops and inquiries based on less than probable cause to search or arrest were necessary because the entry of undocumented aliens creates "significant economic and social problems, competing with citizens and legal resident aliens for jobs, and generating extra demand for social services." 422 U. S., at 878–879. And in *United States* v. *Martinez-Fuerte,* 428 U. S. 543, upholding similarly brief stops and inquiries at permanent checkpoints, the Court relied on the unique difficulty of patrolling a 2,000-mile long and virtually uninhabited border area, a difficulty that would prove insuperable if the Government could stop a vehicle only on the basis of probable cause to believe that that particular vehicle contained illegal entrants. *Id.,* at 552.

It seems clear, therefore, that before a court can uphold a detention on less than probable cause on the ground that it is "reasonable" in the light of the competing interests, the government must demonstrate an important purpose beyond the normal goals of criminal investigation, or must demonstrate an extraordinary obstacle to such investigation.

## II

What the Court approves today is justified by no such special governmental interest or law enforcement need. There were only two governmental purposes supporting the deten-

tion of the respondent.[1]  One was "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found."  *Ante,* at 702.  The other was that "the orderly completion of the search may be facilitated if the occupants of the premises are present."  *Ante,* at 703. Unlike the law enforcement objectives that justified the police conduct in *Terry* and the border stop cases, these objectives represented nothing more than the ordinary police interest in discovering evidence of crime and apprehending wrongdoers.  And the Fourth and Fourteenth Amendments impose significant restraints upon these traditional police activities, even though the police and the courts may find those restraints unreasonably inconvenient.

If the police, acting without probable cause, can seize a person to make him available for arrest in case probable cause is later developed to arrest him, the requirement of probable cause for arrest has been turned upside down.  And if the police may seize a person without probable cause in order to "facilitate" the execution of a warrant that did not authorize his arrest, the fundamental principle that the scope of a search and seizure can be justified only by the scope of the underlying warrant has suffered serious damage.  There is no authority in this Court for the principle that the police can engage in searches and seizures without probable cause simply because to do so enhances their ability to conduct

---

[1] As the Court acknowledges, *ante,* at 702, the record in this case presents no evidence whatsoever that the police feared any threat to their safety or that of others from the conduct of the respondent, or that they could reasonably have so feared.  The Court says that this nevertheless was the "kind of transaction that may give rise to sudden violence . . . ." *Ibid.*  But where the police cannot demonstrate, on the basis of specific and articulable facts, a reasonable belief that a person threatens physical harm to them or others, the speculation that other persons in that circumstance might pose such a threat cannot justify a search or seizure. *Ybarra* v. *Illinois,* 444 U. S. 85, 92–93.

investigations which may eventually lead to probable cause. See *Davis* v. *Mississippi,* 394 U. S. 721, 726–727.[2]

Beyond the issue of the governmental interest justifying the detention, I question the Court's view that the detention here is of the limited, unintrusive sort that permits the Court to engage in a "reasonableness" balancing test. As the Court said in *Dunaway* v. *New York,* 442 U. S. 200, 210, *Terry* v. *Ohio* "defined a special category of Fourth Amendment 'seizures' *so substantially less intrusive* than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." (Emphasis added.) As we then noted in *Dunaway,* the patdown searches in *Terry, Adams,* and *Mimms* were declared legal because they were extremely limited in time and in the degree of personal intrusion. 442 U. S., at 210–211. The Court also noted that in the border cases, the stops normally consumed less than a minute and involved no more than brief interrogation. *Id.,* at 211. Thus, in the rare cases in which the Court has permitted an independent balancing of interests, the police intrusion has been extremely narrow. Moreover, the Court has required that the stop and inquiry or search be "reasonably related in scope to the justification for their initiation," *Terry* v. *Ohio,* 392 U. S., at 29; see *United States* v. *Brignoni-Ponce,* 422 U. S., at 881, and, under that requirement, the unusual governmental or law enforcement interests justifying the patdown stops and border stops

---

[2] In a perplexing citation, the Court notes our holding in *Payton* v. *New York,* 445 U. S. 573, that an arrest warrant based on probable cause justifies entering a person's home to carry out the arrest, and declares that *Payton* "is relevant today." *Ante,* at 704. But I had thought that the very point of the passage the Court quotes from *Payton,* is that the police would be justified in arresting a person in his own home because they had a warrant for his arrest based upon probable cause to believe that he had violated the criminal law. Since it is the absence of such probable cause that lies at the heart of this case, I fail to understand *Payton*'s "relevance."

have provided a limiting principle ensuring the narrowness of the police action. The detention approved by the Court today, however, is of a very different order.

The explicit holding of the Court is that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Ante,* at 705 (footnotes omitted). Though on superficial reading, this language may suggest a minor intrusion of brief duration, a detention "while a proper search is being conducted" can mean a detention of several hours.[3] The police thereby make the person a prisoner in his own home for a potentially very long period of time.[4] Moreover, because of the ques-

---

[3] The record does not clearly reveal the length of the search in this case. In *Harris* v. *United States,* 331 U. S. 145, a Federal Bureau of Investigation search of a one-bedroom apartment for burglar tools and a pair of checks consumed five hours. See also *Stanford* v. *Texas,* 379 U. S. 476, 477.

[4] I also question the Court's confident assertions about the inoffensive nature of the detention in this case. First, the Court says the detention was innocuous because it was less intrusive than the search that was mandated by the warrant. *Ante,* at 701. This reasoning is, of course, circular, since the very question of the severity of the detention arises only because it was not based on a warrant or probable cause.

Second, the Court says that the intrusion was not a serious one because a reasonable-minded citizen would in fact want to be present at a search of his house unless he was fleeing to avoid arrest. *Ibid.* But I must infer that the respondent here did not want to be present in his house during the search, else he would not have brought this claim, and the law cannot penalize him for "fleeing arrest" when the police did not have probable cause to arrest him. This second reason amounts to the view that a person cannot assert his rights under the exclusionary rule if he stands to benefit from the exclusion.

Finally, the Court observes that this sort of detention is not likely to be exploited or unduly prolonged by the police, since the officers are more likely to find the information they seek through the search than through the detention. *Ibid.* I confess I do not understand this reason. It seems no more than a restatement of the view that the police may detain the person to have him available for arrest when they com-

tionable nature of the governmental interest asserted by the State and acknowledged by the Court in this case, the requirement that the scope of the intrusion be reasonably related to its justification does not provide a limiting principle for circumscribing the detention. If the purpose of the detention is to help the police make the search, the detention can be as long as the police find it necessary to protract the search.[5]

In *Dunaway,* the Court reaffirmed that the " 'long-prevailing standards' of probable cause embodied 'the best compromise that has been found for accommodating [the] often opposing interests' in 'safeguard[ing] citizens from rash and unreasonable interferences with privacy' and in 'seek[ing] to give fair leeway for enforcing the law in the community's protection.' " 422 U. S., at 208, quoting *Brinegar* v. *United States,* 338 U. S. 160, 176. Because the present case presents no occasion for departing from this principle, I respectfully dissent.

---

plete the search, but that view merely begs the question whether the potential duration of the search threatens the person with a lengthy detention.

[5] The Court adverts to this problem only by suggesting that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." *Ante,* at 705, n. 21. But the Court provides no criteria for identifying "special circumstances" or for determining when a detention is "prolonged"; in particular, it fails to tell law enforcement officers whether a detention will always be permissible, however protracted, so long as it does not exceed the length of the search of the house. This ambiguity casts doubt on the Court's assertion, *ante,* at 705, n. 19, that its holding will not require individual police officers to engage in the sort of on-the-scene, ad hoc legal judgments which pose a serious threat to Fourth and Fourteenth Amendment protections. *Dunaway* v. *New York,* 442 U. S. 200, 213.