HARRIS, Judge.
The issue on appeal is whether the trial court erred in granting the defendant’s motion to suppress some rock cocaine which the defendant abandoned while he was being detained on suspicion of robbery.
Two women and a man were in the parking lot of Calico Jack’s in Altamonte Springs at approximately 12:30 a.m. when a black man walked up, pulled a gun on them and demanded their purses and wallet. The victims stated that the robber got away with between nine hundred and thirteen hundred dollars in cash, all in one hundred dollar bills. Upon completion of the robbery, the robber simply walked away.
The police were called immediately and the victims described the robber as a black man, six feet tall, 186 pounds, wearing a white tank top, dark pants, and a black hat. This description was sent out over the police radio to units in the area and Officers Grist and Nagowski, working that evening as members of the Ready Response Team, responded to the radio report. The watch commander instructed them to go to the area of Newbury Place Apartments because that was a recognized escape route for offenders leaving the area of this robbery. The Newbury apart *1354 ments are about 1.6 miles from the site of the robbery.
Within a few minutes of their arrival at the Newbury apartments, the officers observed two possible suspects. The first suspect was wearing dark pants but no shirt and no hat. Officer Grist then came upon the second suspect, Bennet Anthony Fleming, who he said matched the description of the robber “exactly.” Grist described Fleming as wearing a white tank top, dark pants and a black hat. Grist’s first sighting of Fleming was about thirty to forty minutes after the robbery had occurred. Before speaking with the suspect, Grist informed the watch commander that he had spotted a black male who matched the description, and arrangements were then made to have the victims brought to the apartment complex to see if they could identify the suspect as the robber. Thus the witnesses were in the process of being transported to the scene before Fleming was ever approached.
Grist and Nagowski drove over to where Fleming was standing in the apartment complex parking lot, identified themselves, and asked Fleming if they could speak with him. They informed Fleming that something had just happened at Calico Jack’s, that they were looking for the person who had done it, and that he matched the description of that person. Grist then conducted a pat-down search for weapons because the BOLO report indicated the suspect had committed armed robbery. The pat-down revealed no weapons and no bulges which would have been consistent with the large amount of cash that was stolen. Officer Grist then asked Fleming for identification which Fleming immediately produced.
The officers detained Fleming while waiting for the victims to arrive for the identification. During the detention, Fleming had his hands in his pockets and turned his back to the officers, at which time he permitted a plastic bag to fall from inside his pant leg onto the ground. Grist .picked up the bag, saw what looked like approximately forty rocks of crack cocaine, and informed Fleming that he was under arrest. Fleming attempted to escape while the officers were handcuffing him, but he was unsuccessful. The victims later identified Fleming as the robber.
Fleming was charged with armed robbery, possession of cocaine, and battery on a law enforcement officer. He moved to suppress the cocaine on the ground that it was the fruit of an unlawful detention. Specifically, Fleming contended that after the pat-down failed to reveal the stolen money or the weapon used in the robbery, the officers had no reasonable suspicion on which to base any further detention of Fleming and he should have been released. He argued that, because the cocaine was found during this illegal detention, it was the “tainted fruit of the poisonous tree” and should be suppressed.
The trial court agreed and granted Fleming’s motion to suppress based on the following reasoning contained in its order:
1. The initial detention and pat-down of Defendant was valid, however, Defendant’s continued detention after Defendant was patted down was unlawful. The Court has considered that Defendant was detained approximately 1.6 miles from the area of the armed robbery, the Defendant matched only some of the characteristics contained in the BOLO as referenced in this cause, the Defendant cooperated with police by giving Officer Grist his identification, and the pat-down of the Defendant by Officer Grist was negative for any weapons or contraband. Any reasonable suspicion that Officer Grist had to stop and detain Defendant were vitiated by the aforementioned facts, therefore, Defendant’s continued detention was unlawful. See James v. State, 556 So.2d 791 (Fla. 1st DCA 1990).
2. The evidence seized from Defendant in this case was obtained only after Defendant was unlawfully detained. Abandonment which is the product of illegal detention is involuntary, and abandoned property must be suppressed. State v. Anderson, 559 [591] So.2d 611 (Fla.1992) (R. 64 — 65).
The State timely appealed this suppression. We reverse.
Section 901.151, Florida Statutes (1993), the Florida Stop and Frisk Law, provides in pertinent part:
*1355 (2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
(3) No person shall be temporarily detained under the provisions of subsection (2) longer than is reasonably necessary to effect the purposes of that subsection. Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof, (emphasis added).
Pursuant to section 901.151, law enforcement officials may detain suspects for a reasonable time to investigate the circumstances warranting an investigatory stop as well as any suspicious circumstances produced by the stop. State v. Merklein, 388 So.2d 218 (Fla. 2d DCA 1980), rev. denied, 392 So.2d 1377 (Fla.1981).
In our case, the trial court erred when, having determined that the initial stop was legal under section 901.151, it then held that Fleming’s continued detention was unlawful after he had produced his identification and the pat-down revealed neither the weapon nor the cash from the robbery.
The “purpose” of the stop, as that term is used in section 901.151, was not merely to determine Fleming’s name but also to determine if he was in fact the person who committed the robbery a short time earlier. Therefore, the fact that Fleming produced identification did not satisfy the purpose of the stop. Nor did the fact that the pat-down failed to reveal the weapon or money (which easily could have been hidden during the time between the robbery and the stop) mean that Fleming was not the robber.
The dispositive question, then, is whether the rather short delay between the stop and the time that the witnesses identified Fleming exceeded the limitations set forth in section 901.151. The United States Supreme Court addressed a similar issue in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) when it determined that the luggage of one stopped under a Terry-type stop may be detained for a reasonable time to permit it to be exposed to a dog-sniff for narcotics. The Court held:
The exception to the probable-cause requirement for limited seizures of the person recognized in Terry and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of “the Fourth Amendment’s general proscription against unreasonable searches and seizures.” ... When the nature and extent of the detention are minimally intrusive of the individual’s Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.
[[Image here]]
Respondent suggests that, absent some special law enforcement interest such as officer safety, a generalized interest in law enforcement cannot justify an intrusion on an individual’s Fourth Amendment interest in the absence of probable cause. Our prior eases, however, do not support this proposition. In Terry, we described the governmental interests supporting the initial seizure of the person as “effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.” Similarly, in Michigan v. Summers, [452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ] we identified three law enforcement interests that justified limited detention of the occupants of the premises during execution of a valid search warrant: “preventing flight in the event that incriminating evidence is found,” *1356 “minimizing the risk of harm,” both to the officers and the occupants, and “orderly completion of the search.”
Detaining Fleming for a short period in order for the eye-witnesses to identify him was “minimally intrusive” of Fleming’s Fourth Amendment interests. And preventing Fleming from fleeing the apartment complex meets one of the Michigan v. Summers interests that justifies limited detention: preventing flight in the event that incriminating evidence is found.
We reverse the order suppressing the evidence and remand for further action consistent with this opinion.
REVERSED and REMANDED.
PETERSON, C.J., and W. SHARP, J., concur.