87 F.3d 1315
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dhia KALASHO and Romel Yousif Denha, Defendants-Appellants.
 Nos. 94-2111, 94-2157.
 United States Court of Appeals, Sixth Circuit.
 June 3, 1996.
 
 Before: MARTIN and BOGGS, Circuit Judges, and HOOD, District Judge.[1]
 PER CURIAM.
 
 
 1
 Defendant Dhia Kalasho appeals his conviction for being a felon in possession of a weapon, pursuant to 18 U.S.C. § 922(g), on the grounds that: (1) the government denied him a fair trial by changing, between indictment and trial, the prior conviction used to prove that he was a felon; and (2) that there was insufficient probable cause to issue a warrant for his arrest. Defendant Romel Yousif Denha appeals the district court's decision that his detention during the arrest of Kalasho did not violate the Fourth Amendment and that statements he made pursuant to the detention would not be suppressed. We affirm both convictions.
 
 
 2
 * On January 11, 1994, agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) and the Drug Enforcement Agency (DEA) were in the process of trying to arrest the Kalasho brothers, Dhia and Tahrir. Two separate arrest warrants were executed that day, one at a house in Detroit and another at a motel in the suburb of Warren. A search warrant was also executed at the house.
 
 
 3
 The execution of the warrants pertaining to the house yielded not Dhia Kalasho, but Romel Denha. ATF agents watched the house and observed a man, believed to be Dhia Kalasho, come and go from the home four times during the day, each time entering without knocking as others were observed to do. As the full contingent of agents arrived to raid the house, they observed this individual and another man leave the house and attempt to enter a nearby van. The man resembling Dhia Kalasho was approached and questioned regarding security measures and dangers at the house. The agents soon realized that Denha was not Dhia Kalasho by comparing him to a photograph of Kalasho, but, as a security precaution, they handcuffed him and placed him in the back of a police car.
 
 
 4
 The second phase of Denha's detention followed the agents' entry and search of the house. At this point, he was escorted back into the house and questioned while sitting on a couch. The agents read Denha his Miranda rights, which he waived, and questioned him regarding his relation to the house. The questioning revealed that there was a loaded firearm in the house, and agents subsequently found a semi-automatic assault rifle under a couch. The agents also found another, unspecified weapon. Mr. Denha told the agents that he had been arrested before, prompting them to take him into custody. After the search was complete, Mr. Denha provided the agents with a written statement in which he confessed to possession of the assault rifle. Denha seeks to suppress this statement.
 
 
 5
 The same day, agents of the federal Drug Enforcement Agency were preparing to execute an arrest warrant, also for Dhia Kalasho, at a local motel. The agents arrived at the motel and were taken to a room by a man who claimed to be the manager of the establishment. The agents made a forcible entry to the room and discovered Dhia Kalasho in bed. Dhia Kalasho was handcuffed and asked for permission to search the room for drugs, weapons, and other dangerous items. Dhia Kalasho gave his permission, and the search revealed a loaded .38-caliber revolver inside the pocket of a coat near the bed. The coat also contained identification and other documents bearing Dhia Kalasho's name. Further questioning yielded an admission from Dhia Kalasho that the revolver was his. He also orally affirmed a written statement to this effect, but refused to sign the statement. A special agent of the ATF arrived, and, after confirming that Dhia Kalasho was a convicted felon, took him into custody.
 
 
 6
 The indictment and trial of Kalasho did not go smoothly. Kalasho's indictment read:
 
 
 7
 That on or about January 11, 1994, in the Eastern District of Michigan, Southern Division, DHIA KALASHO, defendant herein, having been convicted of a crime punishable by imprisonment for a term exceeding one year to wit: Dangerous Drugs Violation on June 11, 1985, in Recorder [sic] Court, Detroit, Michigan did knowingly possess a firearm, to wit: .38 handgun, which had been shipped or transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g) and 924.
 
 
 8
 The trial brought the discovery that this predicate offense for the felon-in-possession count against Dhia Kalasho had been vacated. The government asked the trial court to allow introduction of another, separate conviction to prove the "felon" element of the felon in possession count. When the court appeared amenable to this change, the defendant elected to stipulate to his status as a convicted felon rather than allow the government to prove the point. The jury found Dhia Kalasho guilty and he was sentenced to three years and five months in prison.
 
 
 9
 Denha's trial for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(c)(1) was complicated only by his argument that his seizure and detention outside the house searched by the ATF constituted a violation of his Fourth Amendment rights. The district court treated this as a motion to suppress and denied it. Denha was found guilty by a jury and sentenced to two years and three months in prison.
 
 II
 
 10
 We review de novo the question of whether a difference between statements in an indictment and the government's ultimate theory and evidence at trial constitute reversible error. United States v. Robison, 904 F.2d 365, 368 (6th Cir.1990).
 
 
 11
 Whether the government's introduction of additional felony convictions beyond the state drug conviction that was vacated amounts to reversible error depends upon whether the change is held to be an amendment or a variance. We conclude that this change is a variance, but one that did not prejudice the defendant.
 
 
 12
 In deciding that the evidence of additional convictions is a non-prejudicial variance instead of an amendment, we observe that this circuit has already concluded that an actual amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed on them." Robison, 904 F.2d at 369 (quoting United States v. Ford, 872 F.2d 1231, 1235 (6th Cir.1989)). We also note that a modification,
 
 
 13
 rises to the level of a constructive amendment when "the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."
 
 
 14
 Ford, 872 F.2d at 1236 (quoting United States v. Hathaway, 798 F.2d 902, 910 (6th Cir.1986)). Although Kalasho argues that the introduction of additional felonies should be considered as an amendment, he cannot show that he was convicted of a different offense from that for which he was indicted. Accordingly, we believe the government's actions at trial amounted only to a variance.
 
 
 15
 A variance is defined to occur when "the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." Robison, 904 F.2d at 369 (quoting Ford, 872 F.2d at 1235). Kalasho remained charged with being a felon in possession of a firearm, but the evidence at trial proved facts that were materially different from those alleged in the indictment because Kalasho was proven a felon by virtue of a different felony conviction. These facts are identical to the definition of a variance in Robison.
 
 
 16
 Since a variance only constitutes reversible error when it is deemed prejudicial, Hathaway, 798 F.2d at 911, Kalasho argues that if we find, as we have, that the additional evidence is a variance, we should then find the variance prejudicial. The prejudicial aspect of the additional evidence, according to Kalasho, stems from the fact that he planned to proceed to trial and defend himself by simply pointing to the fact that the felony conviction relied upon by the government had been vacated. In addition, Kalasho argues that the additional evidence forced him to stipulate to his status as a felon and that this constitutes prejudice. Although we agree that the new evidence was a variance, we cannot agree that it was prejudicial.
 
 
 17
 The defendant has the burden to show that a variance was prejudicial, which requires proof that the defendant's substantial rights have been adversely affected. Hathaway, 798 F.2d at 911. Substantial rights, in turn, are infringed upon only when a defendant shows prejudice to his ability to defend himself at trial, or to the indictment's adequacy to bar subsequent prosecutions. United States v. Miller, 471 U.S. 130, 136-39 (1985).
 
 
 18
 The government's decision to offer additional convictions in no way rises to this level of prejudice. Kalasho knew from the indictment that he would have to defend himself against the government's efforts to prove him a felon. Kalasho, more than anyone else, knew that he was a convicted felon on the basis of convictions other than the vacated one the government mentioned in its indictment. It is also established law that the government could prove the "felon" element of a felon in possession charge with as many different past felony convictions as it saw fit. United States v. Burkhart, 545 F.2d 14, 15 (6th Cir.1976). Thus, the government's effort to proceed with additional convictions clearly hurt Kalasho's hopes to win acquittal as a result of the government's initial mistake, but in no way prejudiced his ability to present a legitimate defense at trial. Kalasho's difficulties at trial stem from the fact that he was a felon, and that the government is permitted to prove this status with any number of convictions.
 
 
 19
 This reasoning also addresses Kalasho's concern that he was denied a fair trial because the trial court refused to let him put on evidence that the conviction in the indictment was overturned. Kalasho claims he faced a "Hobson's Choice" that forced him to stipulate to his status as a felon. Given the underlying law that permits the government to "choose its felonies" for proof, Kalasho actually benefitted from the arrangement by escaping a full rendering of his criminal background. The defendant simply chose the path that would minimize his negative exposure to the jury as a result of the government proceeding as it was entitled to.
 
 III
 
 20
 Kalasho also challenges the propriety of the warrant issued for his arrest. On review, the "issuing magistrate's probable cause determination 'should be paid great deference by the reviewing courts....' " United States v. Pelham, 801 F.2d 875, 877 (6th Cir.1986) (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). In addition, reviewing courts are expected to consider the common-sense implications of affidavits rather than construe them in a "hypertechnical" manner that leads to invalidation of the warrant. Ibid.
 
 
 21
 Despite these rather clear standards, Kalasho seeks to exploit one of the more minor background elements of his warrant--the fact that the DEA agent who provided the affidavit regarding Kalasho's involvement with drugs conceded that the price at which the agent bought from Kalasho was so low as to be unbelievable ($50 for 25 grams of cocaine). Kalasho would therefore have us conclude that the warrant was fatally defective because it was issued by a magistrate who "was misled by statements that were knowingly false or made with reckless disregard for the truth," and the "affiant either knew the information was false or acted in reckless disregard for the truth." Kalasho's Brief at 22-23. We do not agree that this statement, one among many in the affidavit for the warrant, was so incredible as to render the magistrate's reliance upon the affidavit unreasonable.
 
 
 22
 The conclusion that the defendant urges is neither consistent with the type of review afforded magistrates' decisions to issue warrants nor even logically compelled by the agent's testimony. The fact that the DEA agent who purchased the drugs would normally be incredulous at such a bargain does not mean that it did not happen. The magistrate had no reason to disbelieve the agent based simply on what appears to be a bargain-basement price for cocaine. Criminal activity will often involve circumstances that are highly unusual, and the reporting of an unusual situation alone by a law enforcement officer should not prevent a magistrate from issuing a warrant where there are no other grounds to question the officer's integrity.
 
 
 23
 Several additional factors support the reasonability of relying on the agent's affidavit. The agent possessed considerable knowledge and expertise in the field dealing with precisely these types of situations. The agent also provided other facts that justified a warrant for Kalasho's arrest, including statements made by Kalasho about his brother's efforts to purchase cocaine, the fact that Kalasho was armed, the fact that an informant later left funds at the same address where the agent met Kalasho and observed the brothers in a state suggesting they were under the influence of drugs. These facts all suggest that Kalasho was involved in the drug trade. Accordingly, we will not now conclude that the magistrate should have focused on the bargain price and rejected the notion that Kalasho should be arrested for dealing drugs.
 
 IV
 
 24
 Defendant Romel Denha argues that he was arrested and detained without probable cause when the ATF agents stopped him after he had just left the Kalasho brothers' house, which the agents were preparing to search. Since his detention led to Denha providing a statement linking him to firearms found in the house, the propriety of the detention governs the use of the statement at trial. When reviewing the denial of a motion to suppress evidence, this court will review findings of fact for clear error while applying a de novo standard to conclusions of law. United States v. Duncan, 918 F.2d 647, 650 (6th Cir.1990).
 
 
 25
 We conclude that the statement did not result from an impermissible detention because Denha was sufficiently related to the house to permit his detention during the search period. The Supreme Court in Michigan v. Summers, 452 U.S. 692 (1981), held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705 (footnotes omitted). We must decide if Denha could properly be detained, similarly to an occupant of the house, based on the reasoning in Summers.
 
 
 26
 Although Denha offers several arguments that his case is different from the situation in Summers, we find none of them persuasive. Denha asserts that since Summers involved the detention of the current resident of the home to be searched, and since he is not the owner of the home the ATF searched, the Summers exception should not apply to him. Denha also distinguishes his detention from that in Summers on the basis that, unlike the detainee in Summers, his detention would not help secure entrance to the building or protect the security of the officers.
 
 
 27
 We believe Denha's relationship to the house as well as his proximity to the house when it was searched bring his detention within the scope of the Summers exception. Denha's emphasis on the difference between his relationship with the house and that of "owners," "residents," or "occupants" is misplaced. Regardless of his legal relationship to the house, the ATF agents had a practical understanding, gained from observing Denha frequently coming and going from the house without knocking as others were observed to do, that Denha was residing at or otherwise using the house on a regular basis. Despite Denha's suggestion that his detention was unnecessary to ensure an orderly and effective search of the house, we note that he was preparing to enter a van only a short distance down the street from the house and that the ATF agents expected to recover illegal firearms from the house. Denha's detention thus prevented him from possibly notifying occupants of the house of an imminent search and also allowed the ATF agents to search without the possibility that Denha or others in his van could attack them while they were preoccupied with gaining entry. Because these concerns are consistent with the basis of the Summers decision and because Denha was observed to have been using the house as if he were a resident, we conclude that his detention did not infringe upon his Fourth Amendment rights.
 
 V
 
 28
 We therefore AFFIRM the convictions of defendants Kalsho and Denha.
 
 
 29
 BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part.
 
 
 30
 I concur in the affirmance of Kalasho's conviction. The substitution of an alternative predicate offense did not result in an actual or constructive amendment of his indictment or a material prejudicial variance thereof. In addition, there was sufficient probable cause to support his arrest warrant.
 
 
 31
 I dissent, however, with regard to the affirmance of Denha's conviction. Denha argued on appeal that his Fourth Amendment rights were violated when he was detained while preparing to enter a van a short distance down the street from a residence that agents were about to search pursuant to a warrant. Although Denha was not a resident of the premises, the majority opinion holds that his detention outside the residence was permissible because he was "sufficiently related to the house" to permit detention while the house was searched.
 
 
 32
 Michigan v. Summers, 452 U.S. 692 (1981), held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705. In that case, the Court held that an individual coming out his front door, proceeding across his porch, and going down his front steps could be detained lawfully and required to re-enter his house when police officers arrived to execute a warrant to search the house for narcotics. Summers indicated that the seizure outside on the sidewalk "was no more intrusive than the detention of [the] residents of the house whom the police found inside." Id. at 702, n. 16.
 
 
 33
 Since Summers, the Sixth Circuit has held that the term "occupants" used in Summers encompasses more than residents, and that visitors may properly be detained while officers execute a search warrant for a residence. United States v. Fountain, 2 F.3d 656 (6th Cir.), cert. denied, 114 S.Ct. 608 (1993). The Sixth Circuit has also ruled on the question of whether a resident who has departed a premises can be required to re-enter his residence and remain there while police execute a search warrant of the dwelling. In United States v. Cochran, 939 F.2d 337 (6th Cir.1991), cert. denied 112 S.Ct. 1166 (1992), officers went to the defendant's residence to execute a search warrant and found that he had left the residence by car. The officers stopped him in his vehicle after he had travelled a short distance. Cochran held that "Summers does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence." Id. at 339.
 
 
 34
 Fountain and Cochran unquestionably give law enforcement officials broad authority to require residents and visitors of a premises to re-enter a residence and remain there during a search. I believe the majority extends Summers too far, however, in holding that an individual who is not a resident of the premises, who is not longer on the premises, and whom agents realize is not the individual they are looking for may properly be detained pursuant to the Summers rationale. I therefore dissent with regard to the affirmance of Denha's conviction.
 
 
 
 [1]
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation