[redacted]

**UNITED STATES of America,**

**v.**

**Ibrahim EL–GABROWNY, Defendant.**

**No. S1 93 Cr. 181 (MBM).**

United States District Court,
S.D. New York.

June 23, 1993.

[redacted]

[redacted]

Henry J. Depippo, Asst. U.S. Atty., S.D. of N.Y., New York City.

William M. Kunstler, Ronald L. Kuby, New York City.

OPINION AND ORDER

MUKASEY, District Judge.

Defendant Ibrahim El–Gabrowny has been indicted on two sets of charges growing out of the February 26, 1993 bombing of the World Trade Center complex. The first group of charges arises from his alleged assault on an agent engaged in executing a search warrant at his apartment on March 4, 1993; the second arises from his alleged possession of forged and altered passports and birth certificates at the time of the alleged assault that is the subject of the first

group of charges. He has moved to suppress the documents that are the subject of the second group of charges, and has argued two alternative theories to support his motion: that the alleged assault did not happen the way the government claims it happened, and that even if it did the agents had no legal basis to search him.

At a pretrial conference on May 20, 1993, it was agreed that to decide the motion before trial based on defendant's first theory would require two trials of the assault case—one in the setting of a suppression motion and the other the trial itself, which would have to go forward regardless of the outcome of the motion. Therefore, it was agreed that that decision will abide the trial, where defendant may testify or present other evidence out of the presence of the jury in connection with the suppression motion if he chooses to do so. It was agreed that defendant's second theory, that the government lacked a legal basis to search him even on its own version of the facts, can be decided based on the papers submitted thus far, which include both a sworn complaint and an affidavit setting forth the government's version of the facts. (5/20/93 Tr. 2–4)

For the reasons set forth below, the motion, insofar as it is based on defendant's second theory, is denied.

## I.

On February 26, 1993, a bomb exploded in a garage at the World Trade Center complex in Manhattan, causing six deaths, numerous injuries, and massive destruction. A search through the debris at the explosion site disclosed parts of the vehicle that had contained the bomb, including a part that carried the alpha-numeric impression of a portion of the vehicle's identification number. (Kuby/Kunstler Aff.Ex. B, p. 2) The vehicle was identified and traced to a rental company, where it was determined that it had been rented by a person named Mohammad Salameh, who carried a New York driver's license with the address 57 Prospect Park, S.W., Apartment 4C, Brooklyn, New York. (*Id.* at 2–3) Salameh was arrested on the morning of March

4, 1993, and the fact of an arrest was widely broadcast the same day. (Kunstler/Kuby Aff.Ex. C, p. 3) Also on that day, a magistrate judge in Brooklyn issued a search warrant for the apartment referred to on Salameh's license, which is the residence of this defendant and his family.[1] That warrant authorized a search for explosives and related devices, among other things. (Kunstler/Kuby Aff.Ex. A)

The same day, agents went to defendant's address to execute the warrant. The government's version of what happened when they got there is contained in the complaint sworn to March 4, 1993, and in the somewhat more expansive May 11, 1993 affidavit of Thomas F. Corrigan, a detective with the New York City Police Department assigned to a task force operating under federal authority. According to the Corrigan affidavit, officers waiting outside defendant's apartment building saw him leave the building and begin to walk down the block, and an order was given to execute the search warrant. At that time, defendant suddenly stopped, turned around, and began to walk back toward the building, where he could see law enforcement officers entering the building to execute the warrant. (Corrigan Aff. ¶¶ 3–5) Corrigan's account continues as follows:

6. As the defendant walked towards the building in which fellow law enforcement personnel were executing the search warrant, his hands were in his coat pockets and as he approached the building his pace quickened.

7. Fearing that the defendant posed a threat to the agents and officers executing the search warrant, I followed the defendant. When I caught up to him, I identified myself as a police officer (I also was wearing my FBI–NYCPD "raid jacket" and my identification shield) and removed the defendant's hands from his pockets to determine whether he had any weapons in his hands.

8. After further identifying myself as a police officer, I requested that the defendant place his hands against a wall. When the defendant refused to comply, I and a fellow member of the [task force] physical-

---

1. Defendant has waived any challenge to venue.

ly placed the defendant's hands against the wall.

9. As we did so, I conducted a "pat down" search of the exterior of the defendant's clothing. As I did so, I felt a rectangular object in the defendant's breast pocket, which I thought may have been plastic explosives.

10. Realizing we may need assistance, I and another member of the search team then began to escort the defendant toward the building where fellow agents and officers were executing the search warrant. As we approached the building entrance, we attempted to secure the defendant with his hands placed against the wall.

11. At that time, the defendant abruptly swung his elbow at me, striking me in the face. He also struck the agent who was with me. After the ensuing struggle, we again secured the defendant.

12. After we did so, I removed the rectangular object from the defendant's pocket, which turned out to be a yellow envelope which was folded and fastened using rubber bands. I then handed the object to a Special Agent of the Bureau of Alcohol, Tobacco and Firearms who was more familiar with handling explosives. He carefully opened the package, and determined there were no explosives in the package. Instead, the inspection revealed that the envelope contained passports and other documents. He then returned the envelope to me and I removed the items. (*Id.*)

## II.

Defendant argues that the agents had no basis under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) or otherwise to stop him on the street, that it appears they were content to let him walk away from the search location, that it was entirely natural and innocent for him to quicken his pace as he saw "a swarm" (Def.Reply Mem. 4) or "a host" (*Id.* at 5) of law enforcement agents "streaming into" (*Id.* at 6) his apartment building, that it was clear defendant posed no threat and there was no legitimate basis to force him back toward his apartment building. He urges that, like the bar patrons in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338,

62 L.Ed.2d 238 (1979), he was in a public place where he had every right to be and there was never a lawful basis to search him. He urges that the rectangular object in his pocket could not have generated a fear that he was carrying plastic explosives because the World Trade Center was detonated with a different kind of bomb.

Defendant also maintains that the search of the envelope cannot be justified even if the arrest was otherwise proper. Rather, the agents should have secured a warrant to search the envelope in the fashion prescribed for closed containers seized at the time of a defendant's arrest. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

## III.

On the facts present here, the agents had two independent bases for stopping El-Gabrowny and frisking him, either of which would be sufficient. First, under *Terry v. Ohio, supra,* a law enforcement officer who encounters objective facts that would convince a reasonably prudent person that his safety or that of others is in danger, 392 U.S. at 21–22, 29, 88 S.Ct. at 1879–80, 1884, may stop and frisk a suspect; and any evidence disclosed as a result will be admitted. Moreover, on the government's version of events, El–Gabrowny swung at the officers before the evidence in question was seized, and the seizure was incident to a lawful arrest following an equally lawful *Terry* stop.

The objective facts the officers encountered here were that a powerful bomb had caused death and destruction, a suspect had been arrested who had a connection with the premises to be searched, that arrest had been publicized, a warrant had been issued authorizing a search for explosives among other things at those premises, and a person also connected with those premises was seen walking toward a place where, if permitted to continue unhindered, he would come up behind agents who were about to execute a search warrant. Those facts were sufficient to justify police officers in stopping El–Gabrowny and assuring that he would not pose a threat to the officers conducting the search.

Nor was it unreasonable in these circumstances to treat the rectangular object the officer felt in El–Gabrowny's pocket as a potential source of danger, despite the fact that the World Trade Center bomb itself apparently was not composed of plastic explosives. First, it is not clear that the agents conducting the search knew at the time the precise nature of the bomb. Moreover, even if they were aware of it, such awareness would not reasonably yield the conclusion that anyone connected with the bombing enterprise necessarily would eschew plastic explosives. Here it bears emphasis that this logic does not mean it would be reasonable in all investigations to treat an unidentified rectangular object as a potential plastic explosive, only that it was reasonable to do so in this bombing investigation. In these circumstances, it was reasonable to seek the help of other agents to neutralize a perceived danger, albeit potential.

■ However, as noted above, justification for the actual seizure does not rest on *Terry* alone because, according to the government, the envelope was not seized as the result of a *Terry* frisk but rather incident to El–Gabrowny's arrest. Once El–Gabrowny swung at the agents, it was proper to arrest him. Once the arrest was effected, it was proper also to search his person incident to that arrest and to seize whatever that search disclosed. *United States v. Robinson*, 414 U.S. 218, 229, 235, 94 S.Ct. 467, 474, 476, 38 L.Ed.2d 427 (1973).

Nothing in *Minnesota v. Dickerson*, —— U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), is to the contrary. In that case, the Supreme Court held that contraband immediately apparent as such to the touch during a *Terry* frisk may be seized and received as evidence, but that an ambiguous lump encountered during that kind of frisk may not be manipulated after a determination has been made that it is not a weapon, and then seized as evidence when such manipulation proves it to be another sort of contraband. There is nothing in the government's recitation of facts here to suggest that the rectangular object was manipulated at all, let alone that such manipulation resulted in its seizure. Equally important, there is no occasion here to consider whether it could have been seized as a result of the *Terry* frisk because it was seized only after and incident to arrest.

■ Nor was it necessary, as El–Gabrowny argues, that the agents set the envelope aside until they could obtain a warrant pursuant to *United States v. Chadwick, supra.* As *Chadwick* itself recognizes, if there is reason to believe that an object may be immediately dangerous, "it would be foolhardy to transport it to the station house without opening the [object] and disarming the weapon." 433 U.S. at 15 n. 9, 97 S.Ct. at 2485 n. 9. *Chadwick* holds only that a closed container seized at the time of an arrest which appears to pose no danger must be the subject of a warrant before it can be searched.

■ The second sufficient basis for the seizure and pat search of El–Gabrowny arises from *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), which holds that law enforcement officers who arrive at the location where they intend to execute a search warrant, and encounter outside the premises they intend to search a person who is an occupant of those premises, may compel that person to return to those premises and remain there while the search is being conducted. The existence of the warrant and the connection between the person they confront and the premises to be searched provide both objective justification for the detention and the basis for suspecting that that person is connected to criminal activity. *Summers*, 452 U.S. at 703–04, 101 S.Ct. at 2594–95.

■ Assuredly, *Summers* did not announce a rule that any person on premises being searched may also be searched, but it did specify that "the interest of minimizing the risk of harm to the officers" is one of the justifications for the holding that those on the premises being searched may be detained. *Id.* at 702, 101 S.Ct. at 2594. Accordingly, officers may not only detain occupants of premises being searched but also may make a limited search of such persons to the extent necessary to assure that they do not pose a hazard. *United States v. Barlin*, 686 F.2d 81, 87 (2d Cir.1982).

Although El–Gabrowny argues that the officers had no intention of returning him to his apartment as *Summers* permitted, so long as he was headed away from his apartment building, that is not at all clear. What is clear is that he turned around and was headed back toward the building. Nor is the calculus changed by Corrigan's statement that when he walked El–Gabrowny back toward the apartment building he was seeking help in dealing with the rectangular object suspected of being a plastic explosive, apparently without any thought that he was also exercising a law enforcement prerogative vouchsafed by *Summers*. The applicable law requires only that law enforcement officers act in a constitutionally permissive fashion, not that they think in constitutionally exhaustive categories while doing so. The availability of a rationale based on *Terry* and a search incident to a lawful arrest does not foreclose an alternative rationale based on *Summers*.

For the foregoing reasons, that portion of El–Gabrowny's motion which seeks to suppress the seized documents based on the government's own account of the circumstances surrounding the seizure is denied.

SO ORDERED.

