UNITED STATES of America,

v.

Ibrahim A. EL–GABROWNY,
et al., Defendants.

No. S5 93 Cr. 181 (MBM).

United States District Court,
S.D. New York.

Dec. 20, 1994.

Mary Jo White, U.S. Atty. for the S.D.N.Y., Patrick J. Fitzgerald, Robert S. Khuzami, Andrew C. McCarthy, Asst. U.S. Attys., New York City, for U.S.

Ronald L. Kuby, William M. Kunstler, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

This is the second opinion to deal with a motion by defendant Ibrahim A. El–Gabrowny to suppress documents seized from him at the time of his arrest on March 4, 1993. The first is reported at 825 F.Supp. 38 (S.D.N.Y. 1993).[1] As set forth below, because the evidence presented at a suppression hearing shows that the documents in question inevitably would have been discovered during an inventory search following El–Gabrowny's lawful arrest, the motion is denied. Further, because the facts established at the suppression hearing necessarily supersede the averments in the motion papers on which the earlier opinion was based, this opinion supersedes that earlier opinion.

### I.

El–Gabrowny was arrested for his alleged assault on agents who were helping to execute a search warrant at El–Gabrowny's home. The warrant was issued in connection with the investigation into the February 26, 1993 bombing of the World Trade Center that killed six people, injured many others and caused massive destruction. The documents are forged and altered Nicaraguan passports and birth certificates that were

---

1. El–Gabrowny took the view in his motion papers that although he disputed the government affiant's account of the incident that led to seizure of the documents, even if that account were accepted *arguendo*, suppression would have to be granted. At the time El–Gabrowny's motion was filed, he was the only defendant in the case and the only charges against him were based on possession of the documents and his alleged assault on the agents just before the documents were seized. Because the entire trial as then envisioned would concern the same incident that would be explored at a suppression hearing, it was agreed, for the sake of efficiency, that the trial and the suppression hearing would be combined. *El–Gabrowny*, 825 F.Supp. at 40. The first opinion therefore was based on the government affiant's account. When a later superseding indictment added charges and defendants, and the documents became relevant to some of those charges and at least one other defendant, El–Sayyid Nosair, the stratagem of combining the trial and the suppression became impossible to pursue.

apparently intended to serve as travel documents for codefendant El–Sayyid Nosair and his family. Among the charges against both defendants are the seditious conspiracy and the bombing conspiracy charged in Counts One and Five, which include the World Trade Center bombing.

Before the warrant was issued on March 4, 1993, a search through the debris at the World Trade Center explosion site had yielded pieces of the vehicle that had contained the bomb, including a piece that carried the alpha-numeric impression of part of the vehicle's identification number. (Kuby/Kunstler Aff.Ex. B, p. 2) The vehicle was identified and traced to a rental company, where it was determined that it had been rented by Mohammad Salameh, who carried a New York driver's license with the address 57 Prospect Park, S.W., Apartment 4C, Brooklyn, New York. (*Id.* at 2–3) Salemeh was arrested on the morning of March 4, and the fact of the arrest was widely broadcast the same day. (Kunstler/Kuby Aff.Ex. C, p. 3) Also on that day, a magistrate judge in Brooklyn issued a search warrant for the apartment referred to on Salameh's license, which was the residence of El–Gabrowny and his family. The warrant authorized a search for explosives and related devices, among other things. (Kunstler/Kuby Aff.Ex. A)

The facts developed at the hearing begin with the agents' arrival in the vicinity of El–Gabrowny's apartment building. Detective Thomas Corrigan of the New York City Police Department and Special Agent Michael M. Burke of the Bureau of Alcohol, Tobacco and Firearms were the officers immediately involved in the challenged seizure; both testified at the hearing.

Both officers were in vehicles on the street outside El–Gabrowny's apartment building before agents entered that building to effect the search. (10/11 Tr. 5–7, 55) Corrigan was aware that the warrant included explosives or bomb components among the items to be sought in El–Gabrowny's apartment. (*Id.* at 6) Both officers heard a radio transmission from a surveillance unit stating that El–Gabrowny had left his building and was walking down the street. (*Id.* at 5–6, 55) Corrigan heard a radio transmission directing agents, presumably those on surveillance, to watch El–Gabrowny. (*Id.* at 27)

As the order was given for those who would execute the search to enter the building, and they began to do so, El–Gabrowny turned and started to walk back toward the building at an accelerated pace. His hands were thrust in the pockets of his jacket. Corrigan recalled hearing a radio transmission directing that El–Gabrowny be stopped, but in any event he had already decided to do that although, as El–Gabrowny notes, Corrigan accepted on cross-examination counsel's statement that at the time of the stop "you had no basis to believe that Mr. El–Gabrowny was committing or had just committed a crime." (*Id.* at 32, 33) Burke and Corrigan both came up behind El–Gabrowny, identified themselves as police officers, removed his hands from his pockets, and tried to place his hands against a wall so that the officers could frisk him. (*Id.* at 8–9, 57–58)

Both officers testified that El–Gabrowny resisted, removing his hands from the wall, demanding that the officers leave him alone, and the like. (*Id.*) Their recollections of the ensuing events differ, as follows. Corrigan testified that El–Gabrowny "made a motion towards the front of his jacket." (*Id.* at 9) Corrigan "didn't like that at all." (*Id.* at 9, 41) After El–Gabrowny's hands had been replaced on the wall, Corrigan started to frisk him and "felt in the inside breast pocket a rectangular object kind of firm about five or six inches in length and maybe three inches in width." (*Id.*)

El–Gabrowny suggested on cross-examination, and in his memorandum, that when the package in his pocket was touched, its feel should have dispelled any suspicion of plastic explosives because it was hard and lacked the "hard rubber" malleability or "give" of such explosives. (*Id.* at 15–16, Def.Mem. at 18–19) However, there would not appear to be much if any inconsistency between the "hard rubber" feel of plastic explosives and the firm feel of an envelope containing passports, wholly apart from the fact that a malleable substance may be contained within firmer packaging.

Corrigan testified that he was concerned the object might be plastic explosive, and directed either a facial expression or a gesture to Burke. (*Id.* at 10, 42–43) He and Burke then walked El–Gabrowny back toward the building to find "a supervisor and the bomb squad guy, that would be a little bit more knowledgeable." (*Id.* at 10) They placed El–Gabrowny again with his hands on a wall, and soon thereafter El–Gabrowny struck at them with his arms, hitting Corrigan in the jaw and Burke in the chest. (*Id.* at 11–12) The three men fell to the ground, and another agent put handcuffs on El–Gabrowny. (*Id.* at 12)

Burke's testimony differed from Corrigan's principally in that he recalled two frisks. Burke said he conducted the first one at the first location on the street where the agents stopped El–Gabrowny—"a quick patdown to see what was in his pockets and around his waist area"; it disclosed nothing. (*Id.* at 79) Corrigan conducted the second frisk after El–Gabrowny had been moved to the second location closer to his apartment building; it disclosed the hard object in El–Gabrowny's breast pocket. (*Id.* at 58) Burke said that El–Gabrowny was moved to the second location because the first was "kind of a tight situation" and El–Gabrowny's resistance to being frisked posed a potential problem. (*Id.* at 57–58) According to Burke, it was during the second frisk, when Corrigan touched the object in El–Gabrowny's pocket, that the defendant swung backward and struck the officers with his arms and elbows (*id.* at 82–83), and was then subdued and handcuffed.

This differing recollection is minor in itself, and its significance diminishes still further when one considers that Corrigan testified he did not know whether Burke had patted El–Gabrowny's pockets (*id.* at 36), and that there had been no oral communication between the officers as to the reason for moving El–Gabrowny from the first location to the second, but only a gesture or a facial expression by Corrigan, and possibly a statement that he had found something (*id.* at 16, 43, 82). Thus, Corrigan does not contradict Burke's recollection that Burke conducted a brief pat-down at the first location, and absent explicit oral communication, the two officers easily could have recalled different reasons for moving El–Gabrowny from the first location to the second.

Potentially more troublesome is Corrigan's disclosure for the first time at the hearing that El–Gabrowny made a gesture in the direction of his breast pocket. As El–Gabrowny's counsel stressed on cross-examination, and in his papers, that fact had been omitted from both his statement on the day of the arrest as recorded by FBI agents (GX 3514 A) and his affidavit in opposition to El–Gabrowny's suppression motion, sworn to May 11, 1993 (DX A). (10/11 Tr. 19–26; Def.Mem. at 7 n. 3) However, by the time this alleged gesture was made, El–Gabrowny had already been stopped and, as appears below, the agents' right to frisk him did not depend on any such gesture.

After El–Gabrowny had been handcuffed, and the envelope was still in his pocket, Corrigan and Burke walked El–Gabrowny into the lobby of his building. There, Corrigan removed the envelope from El–Gabrowny's breast pocket and handed it to Burke, who sniffed the envelope, undid the rubber bands around it, and opened the envelope to disclose "booklets" within. (*Id.* at 12–13) Burke then handed the envelope back to Corrigan, who opened and examined what proved to be the passports and birth certificates at issue on this motion. (*Id.* at 49–51)

## II.

■ El–Gabrowny challenges after the hearing, as he did earlier, the officers' right to stop him and to conduct a frisk. However, the evidence developed at the hearing confirms that both *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), justified the stop and frisk. *El–Gabrowny,* 825 F.Supp. at 41–43. *Terry* directs that the conduct of the officers be judged against the following "objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880 (citation omitted). More specifically, "the issue is whether a reason-

ably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883.

Here, an array of objective facts justified that belief: A powerful bomb had caused death and destruction, a suspect had been arrested who had a connection with the premises to be searched, that arrest had been widely publicized, a warrant had been issued authorizing a search for explosives among other things at those premises, and a person also connected with those premises who probably knew of the widely publicized arrest was seen walking toward where, if permitted to continue unhindered, he would come up behind agents who were about to execute a search warrant. Those facts were sufficient to justify the police officers' decision to stop El–Gabrowny and assure that he would not pose a threat to the officers conducting the search or to those who stopped him. Such assurance could be provided only by a frisk sufficient to disclose any kind of weapon or destructive device El–Gabrowny might be carrying.

Nor was it unreasonable in these circumstances to treat the rectangular object the officer felt in El–Gabrowny's pocket as a potential source of danger, despite the fact that the World Trade Center bomb itself apparently was not composed of plastic explosives. First, it is not clear that the agents conducting the search were aware at the time of the precise nature of the World Trade Center bomb. Moreover, even if they were aware of it, such awareness would not reasonably yield the conclusion that anyone connected with the bombing enterprise necessarily would eschew plastic explosives. Thus, it was reasonable to seek the help of other agents to neutralize even a potential danger.

Nothing in Corrigan's testimony is to the contrary. His amiable concession during cross-examination that he had no reason to believe at the time he initially approached El–Gabrowny that that defendant was committing or had committed a crime (11/10 Tr. 32) is irrelevant for three reasons. First, the standard to be applied is an objective one. Second, cause to believe that a crime has been or is being committed may justify a stop, but the inquiry does not end there; the crux of the inquiry involves the objective assessment of a likely danger in the immediate future. Here, there was ample reason to take precaution against such danger because El–Gabrowny was intimately associated with premises that were themselves associated with a violent crime, and he was walking in determined fashion toward the building where agents were about to execute a search warrant.

Third, as soon as El–Gabrowny struck the agents, as he has not denied in connection with this motion that he did, he had undeniably committed a crime and it was proper to arrest him. Even if it is hypothesized that the seizure of El–Gabrowny on the street was not justified by the circumstances set forth above, he was not privileged to respond by striking the officers who were trying to frisk him when it was clear that they were engaged in the performance of official duties. *United States v. Martinez,* 465 F.2d 79, 82 (2d Cir.1972).[2] Once the arrest was effected, it was proper also to search his person incident to that arrest and to seize whatever that search disclosed. *United States v. Robinson,* 414 U.S. 218, 229, 235, 94 S.Ct. 467, 474, 476–77, 38 L.Ed.2d 427 (1973).

El–Gabrowny insists that the agents were not justified in seizing incident to his arrest the items found on his person, and making an inventory of those items, but rather were required to return all items found on his person to the custody of his wife in his apartment. He bases this argument on the following snippet from *United States v. Perea,* 986 F.2d 633 (2d Cir.1993): "When a

---

**2.** The Supreme Court held in *John Bad Elk v. United States,* 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900) that a citizen may use necessary force to resist an unlawful arrest. Whether or not that much criticized case remains good law, *see, e.g., United States v. Heliczer,* 373 F.2d 241, 247 n. 3 (2d Cir.) (quoting Judge Learned Hand's suggestion that the holding invites anarchy), *cert. denied,* 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967), the force employed by El–Gabrowny exceeded necessary resistance and crossed the line into assault.

person is arrested in a place other than his home, the arresting officers may 'impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area.'" *Id.* at 643 (citations omitted). From this he reasons that the inventory search exception to the probable cause requirement applies *only* when a defendant is arrested away from his home, and that since El–Gabrowny was arrested on the street right outside his apartment building and was brought into the lobby of that building, his possessions should have been treated as if he had been arrested in his home, and brought there after his arrest.

*Perea* will not support the weight of that argument nor yield the result El–Gabrowny seeks: *Perea* dealt with the search of a duffel bag in the defendant's possession in the trunk of a car when he was arrested; it did not deal with, and there was no occasion for the Court to treat, items found on the person of a defendant at the time of his arrest even in his apartment. Further, El–Gabrowny was arrested "in a place other than his home"—*i.e.,* on the street, as soon as it became apparent that the encounter was "'too intrusive to be classified as an investigative detention[.]'" *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991) (quoting *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir.1989)). Certainly, when the officers succeeded in handcuffing El–Gabrowny after the assault and ensuing struggle, he was under arrest. Thus, the obvious rationale for the limitation recognized in *Perea* that an inventory search deal only with items found in a defendant's possession when he is arrested away from his home, lest an arrest at home become the occasion for a warrantless search of the home, does not apply.

■ Finally, even if one could somehow read *Perea* to prescribe the procedure El–Gabrowny would have me impose, we must remember what was going on at El–Gabrowny's apartment when and after he was arrested. That apartment was being searched pursuant to a warrant that authorized seizure *inter alia* of "documents relating to the procurement of materials used in the construction or manufacture of explosive devices." (Kunstler/Kuby Aff.Ex. A) Once the pass-

ports and other documents were examined to determine whether they fit the description of documents that could be seized pursuant to the warrant, their incriminating character likely would have been perceived and they were subject to seizure as evidence in plain view. *United States v. Ochs,* 595 F.2d 1247, 1257 n. 8 (2d Cir.) (Friendly, J.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

In sum, El–Gabrowny's argument, however imaginative, is simply unavailing.

### III.

■ The second sufficient basis for the seizure and pat search of El–Gabrowny arises from *Michigan v. Summers,* 452 U.S. 692, 694, 101 S.Ct. 2587, 2589–90, 69 L.Ed.2d 340 (1981), which holds that law enforcement officers who are about to execute a search warrant, and encounter outside the premises they intend to search a person who is an occupant of those premises, may compel that person to return to those premises and remain there while the search is conducted. The existence of the warrant and the connection between the person they confront and premises to be searched provide both objective justification for the detention and the basis for suspecting that that person is connected to criminal activity. *Summers,* 452 U.S. at 703–04, 101 S.Ct. at 2594–95.

■ Assuredly, *Summers* did not announce a rule that any person on premises being searched may also be searched, but it did specify that "the interest of minimizing the risk of harm to the officers" is one of the justifications for the holding that those on the premises being searched may be detained. *Id.* at 702, 101 S.Ct. at 2594. Accordingly, officers may not only detain occupants of premises being searched, but also may make a limited search of such persons to the extent necessary to assure that they do not pose a hazard. *United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982). El–Gabrowny's belligerent refusal to remain in position for a frisk and to keep his hands against the wall, simply heightened the need for such assurance. Once again, as soon as El–Ga-

browny struck the agents, his arrest and the subsequent search were justified.

Although El–Gabrowny argues that the officers had no intention of returning him to his apartment as *Summers* permitted, so long as he was headed away from his apartment building, that is not at all clear. Corrigan recalled hearing a radio transmission directing that El–Gabrowny be stopped. See p. 497, *supra*. What is clear is that El–Gabrowny turned around and was headed back toward the building. Nor is the calculus changed by Corrigan's statement that when he walked El–Gabrowny back toward the apartment building, he was seeking help in dealing with the rectangular object suspected of being a plastic explosive, or by Burke's testimony that El–Gabrowny was moved from the first location to the second because the officers felt hemmed in at the first location—neither officer giving any thought to the possibility that he was also exercising a law enforcement prerogative vouchsafed by *Summers*. The applicable law requires only that law enforcement officers act in a constitutionally permissible fashion, not that they also think in constitutionally exhaustive categories while doing so. *See Ochs*, 595 F.2d at 1256 ("[T]he test is what could lawfully be done, not what the policemen thought the source of their power to be."). The availability of a *Terry* rationale does not foreclose an alternative *Summers* rationale.

### IV.

In any event, once El–Gabrowny assaulted the agents after he was permissibly stopped and frisked, there was set in train a course of events that would have resulted inevitably in the discovery of the documents at issue. *Perea*, 986 F.2d at 644. It was established at a resumed hearing on November 8, 1994 that the FBI has a standard procedure for dealing with items of personal property removed from a person who has been arrested, as follows:

> Items of personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried by Agents prior to being stored for safekeeping. A receipt for such property should be prepared and given to the arrestee. This inventory should include the contents of containers such as purses, shoulder bags, suitcases, etc., whether or not the containers are locked or sealed. In the event such containers are locked or sealed great care must be taken to minimize damage to the container or its contents while gaining access. This caretaking function must not be construed as an alternative to a search warrant whenever there is probable cause to believe that evidence or contraband is inside a container. Under those circumstances the container should be secured until a search warrant can be obtained.

(GX 3516 C)

Here, the items that had been in El–Gabrowny's possession when he was arrested were placed on a table at FBI headquarters, and two agents who had had nothing to do with the matter until then were asked to prepare an inventory. (11/8 Tr. 4–10) They did so, although they did not provide El–Gabrowny with a receipt for the inventoried items. (*Id.* at 11)

El–Gabrowny argues that the only permissible inventory search is one performed pursuant to a routine procedure, *see Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983) ("The question here is whether . . . it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station house incident to booking and jailing the suspect."), and attacks the inventory search at FBI headquarters in two respects for allegedly deviating from "routine administrative procedure." First, he notes that the search was performed by agents who were not involved in the arrest, whereas the testimony at the hearing established that usual procedure was to have the search conducted by agents who were involved in the arrest. (11/8 Tr. at 7) Second, he points out that the written FBI procedure requires issuance of a receipt to the arrestee, whereas none was issued to El–Gabrowny.

However, there is no evidence that either of these deviations from usual or mandated procedure was artful or worked to El–Gabrowny's prejudice. In particular,

there is no evidence that agents not involved in El–Gabrowny's arrest were used to avoid the FBI's own written rule that the inventory procedure should not be used "when there is probable cause to believe that evidence or contraband is inside a container." (GX 3516 C, *supra*) One of the agents who conducted the inventory search testified that although it was usual for arresting agents to do the inventory and attendant paperwork, "they were kind of tired and they kind of stuck us with it." (*Id.* at 7) Failure to give the receipt was entirely inconsequential and does not stand as ·evidence of any larger problem. *See Colorado v. Bertine,* 479 U.S. 367, 369, 107 S.Ct. 738, 739–40, 93 L.Ed.2d 739 (1987) (upholding inventory search described by the District Court as having been performed "in a 'somewhat slipshod' manner").

For the above reasons, El–Gabrowny's motion to suppress the documents seized from his person at the time of his arrest is denied.

SO ORDERED.