Filed 7/28/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTIAN ABRAHAM CASTILLO,<br><br>    Defendant and Appellant. | D063266<br><br><br><br>(Super. Ct. No. JCF29156) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge. Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J.T. Carlton and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

In this case, we reject defendant's contention that the trial court erred when it denied his pretrial request to enforce a negotiated disposition because there was no

agreement for the court to enforce and even assuming defense counsel's representation was deficient, the defendant could not establish prejudice. We also conclude the trial court did not err when it denied defendant's motion to suppress evidence of statements he made to police as having been taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) because the defendant was not in custody when, prior to the execution of a search warrant on a residence, a police officer asked defendant two questions while the defendant and two others sat handcuffed in the residence.

GENERAL FACTUAL AND PROCEDURAL BACKGROUND

On a morning in July 2012, members of the El Centro Police Department SWAT team and other narcotics investigation officers executed a forced entry search of Christian Abraham Castillo's residence where it was believed that a known drug dealer sold narcotics. Castillo, his girlfriend Crystal Obeso, and his brother Alfredo Castillo, were inside the residence. At the time, police did not have any information on Castillo. During their search, officers found, among other things, a salable quantity of methamphetamine, cash, a digital scale and a handgun.

A jury convicted Castillo of possessing methamphetamine for sale and being a felon in possession of a firearm. It also found true the allegation that Castillo was armed with a firearm when he possessed the methamphetamine for sale. The trial court subsequently found true the allegation that Castillo had previously been convicted of a drug-related offense. The trial court sentenced Castillo to a total prison term of nine years.

2

DISCUSSION

I. *Motion to Enforce Plea Bargain*

A. Factual Background

Prior to the preliminary hearing, the prosecutor offered five years and stated that if the offer was rejected, the People would be adding an additional "five-year" firearm enhancement. Defense counsel explained that when he relayed the initial five-year offer to Castillo in August, he informed Castillo that if Castillo rejected the offer, the People would file an amended complaint to add the firearm enhancement and that the additional charges would raise Castillo's maximum exposure to 11 years in prison. Castillo rejected the offer.

In early October 2012, defense counsel calendared a motion to disclose the identity of confidential informants, which was set for hearing on October 24. (All further date references are to 2012.) During negotiations before the hearing on the motion, the prosecutor told defense counsel that the People might be open to a counteroffer, wherein defense counsel inquired about three years. The prosecutor responded, "'Make me the offer. We might consider it.'" Castillo, however, never made a counteroffer.

Later that day, defense counsel visited Castillo and talked to him about making an offer consistent with the prosecutor's suggestion. During that discussion, defense counsel *incorrectly* told Castillo that his maximum exposure in the case was seven years eight months. Defense counsel told Castillo he believed the motion to disclose confidential informants was "a close call and could go either way." Defense counsel informed

Castillo that if he lost the motion to disclose confidential informants, no further plea offers would be considered and the case would proceed to trial.

If the motion was granted, however, "it was very likely that the case would be dismissed." Defense counsel advised Castillo that a three-year deal was "very fair" and recommended that he "make such an offer to avoid the harsher consequences that could result if he lost his motion and the trial." Castillo informed counsel that he "wanted to take his chances with the motion, and declined to make a three year offer to settle the case based partially on this factor."

Sometime thereafter, defense counsel informed Castillo he had misadvised him regarding his maximum exposure. During that discussion, Castillo responded by saying he would have chosen to make an offer to settle the case for three years had he known his exposure was eleven years eight months.

On the first day of trial, the court heard and denied Castillo's *Miranda* motion. Later that day, defense counsel informed the court that he had misadvised Castillo on his potential exposure in the case. Defense counsel argued that Castillo would have made a three-year offer had he understood his total exposure and that Castillo was moving to specifically enforce a three-year plea bargain. Given his error, defense counsel felt that separate counsel should be appointed to file a formal motion on the issue.

The prosecutor told the court that had defense counsel made an offer to resolve the case that included a three-year prison term, her office "probably" would have accepted such an offer at that time. The prosecutor also disclosed that she had spoken to defense counsel the prior evening, but that Castillo was not willing to accept three years and that

4

he wanted a year. At a later hearing, defense counsel confirmed that he had offered one year in a program plus one year county jail, but the prosecutor declined the offer. The court denied the oral motion, stating it would consider a written motion, but that "there has to be an agreement to enforce."

After a jury had been sworn and pre-instructed, Castillo filed a written motion to enforce the plea bargain. Citing *In re Alvernaz* (1992) 2 Cal.4th 924 (*Alvernaz*), Castillo asked the court to enforce a three-year plea bargain. Alternatively, he asked for a new trial "with a resumption of the plea bargaining process." The trial court denied the motion finding that *Alvernaz* did not control because no offer of three years had been made or accepted by either party and the evidence did not support Castillo's claim that he would have taken such a deal at that time even if he had been accurately advised of his prison exposure. As to this second point, the court explained the following:

> "I don't think there is anything about the advice that you gave him, and I'm not convinced that he would have ever made such an offer given he was essentially looking at the motions as a chance to prevail in the case and he was looking at that. That's [what] the evidence tends to show; he was betting on that, so to speak, and not making an offer. He made subsequent offers and so forth. I think even the fact he made an offer later on for less time and was rejected tends to support that."

Before closing arguments, Castillo offered to settle the case for a four-year prison term, but the district attorney rejected that offer.

B. Analysis

Castillo contends the trial court erroneously denied his pretrial request to enforce a negotiated disposition because the record demonstrates that defense counsel incorrectly

advised him regarding the plea, he would have accepted the plea if he had been properly advised, the prosecution would have accepted the counteroffer if it had been made and the court would have accepted the plea. The People assert Castillo's arguments lack merit because there was no agreement for the court to enforce and even assuming defense counsel's representation was deficient, Castillo cannot establish prejudice. We agree with the People.

In criminal proceedings, plea bargaining is a critical stage at which a defendant is entitled to effective assistance of counsel. (*Alvernaz*, *supra*, 2 Cal.4th at p. 933.) The rendering of ineffective assistance at this stage constitutes a violation of the defendant's constitutional right to counsel, which is not remedied by a fair trial. (*Id.* at p. 936.) Accordingly, when a defendant is misadvised by counsel, rejects a guilty plea based on that erroneous advice, and is later convicted at trial, the defendant may assert a claim of ineffective assistance of counsel, even if the defendant receives a fair trial. (*Id.* at pp. 934-936.)

To demonstrate constitutionally inadequate representation, a defendant must show (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance subjected the defendant to prejudice, i.e., there is reasonable probability that, but for counsel's failings, the result would have been more favorable to defendant. (*Alvernaz*, *supra*, 2 Cal.4th at pp. 936-937.) We conduct an independent review of the record to determine if appellant met his burden. (*Id.* at pp. 944-945.) To demonstrate prejudice in the context of rejecting a plea bargain, the defendant must prove there is a

6

reasonable probability he would have accepted the plea bargain and the court would have approved the bargain. (*Id.* at p. 937.)

Here, it is undisputed that neither party offered a three-year plea bargain. Because no formal plea offer was made, *Alvernaz* does not apply. Rather, we examine the record to determine whether counsel's representation was deficient and whether any deficient performance subjected the defendant to prejudice. Because defense counsel incorrectly advised Castillo regarding the maximum sentence, the key question before us is whether that erroneous advice prejudiced Castillo. To establish prejudice from the erroneous advice, Castillo must show a reasonable probability that if properly advised by counsel, he would have tendered a three-year plea offer, that the People would have accepted the plea offer and that it would have been approved by the trial court. (See *Alvernaz*, *supra*, 2 Cal.4th at p. 937.)

On this record, we cannot conclude that Castillo would have tendered a three-year plea offer if he had been properly advised. When Castillo rejected the prosecutor's five-year offer, defense counsel correctly informed him that his potential exposure was 11 years in prison. Defense counsel later misinformed Castillo of his potential exposure when he suggested that Castillo offer a three-year plea. At that time, defense counsel advised Castillo that three years would be a "fair outcome" and making the offer avoided the potential consequences of losing the motion and losing at trial. Castillo rejected this advice and declined to make the offer, with defense counsel explaining that Castillo wanted "to take his chances with the motion." Thus, defense counsel's declaration suggests Castillo declined to make the offer because he hoped to win the motion, not

7

because he was incorrectly told that his potential exposure was seven years eight months, rather than 11 years.

This conclusion is supported by the exchange between the prosecutor and defense counsel on the evening before defense counsel made his oral motion to enforce a plea bargain. At that time, Castillo was *not willing* to accept three years and instead offered one year in a program, plus one year in county jail. Accordingly, we conclude the trial court properly denied Castillo's motion to enforce a negotiated disposition and that any ineffective assistance was not prejudicial.

## II. *Alleged Miranda Violation*

A. Factual Background

El Centro Police Officers John Tang and James Thompson testified at the hearing on Castillo's *Miranda* motion as follows.

A SWAT team comprised of about five people entered the residence by forcing the door open. The SWAT team handcuffed Castillo, Alfredo and Obeso and had them sit on the sofa. The SWAT team left shortly after Officers Tang and Thompson entered the residence. When Officers Tang and Thompson entered, Officer Thompson immediately told the individuals that they were not under arrest, that they were being detained for the purpose of serving a search warrant, and asked who was responsible for the residence as he did not know the three individuals and did not see anyone listed on the search warrant. When Officer Thompson asked this question, only he and Officer Tang were with the three individuals.

8

Officer Thompson testified that he asked who was responsible for the apartment so that he could serve the search warrant. He explained, "[I]f an individual is listed on the search warrant, sometimes there are other parties that are responsible for the actual location. We not only have to serve the individual that is listed on the search warrant, we also have to serve the responsible party of the location as well." After Castillo responded that he was responsible for the apartment, Officer Thompson asked if Castillo was responsible for all of the property in the residence. Castillo responded affirmatively. Officer Thompson explained that he needed to ask this question because the officers "were required by law to provide a property receipt for all items taken and [had] to provide it to the rightful owner. I know that from my experience sometimes different people who aren't related occupy different rooms, and I need to identify what property belongs to who for receipts."

For their safety, Officer Thompson had the three individuals step outside while a canine cleared the residence. Officer Tang did not have a gun drawn and described the situation as "pretty casual" even though the individuals were handcuffed. While the individuals were outside, Officer Tang searched Alfredo after confirming that he was on probation. Officer Tang found methamphetamine on Alfredo and arrested him. Officer Tang also searched Castillo after obtaining his permission. After the canine search, Officer Tang had the individuals return to the sofa. Officer Thompson then gave Castillo a copy of the search warrant to read. About three or four other individuals conducted the search under Officer Thompson's direction. Castillo was arrested after the search. When Officer Thompson asked Castillo who he would like to be responsible for the residence as

9

the police could not lock the door, Castillo asked Officer Thompson to call Castillo's mother.

Based on this evidence, defense counsel argued that *Miranda* barred the use of Castillo's statements to Officer Thompson because Castillo was in custody when the questions were asked and the questions were designed to elicit incriminating information. The prosecutor argued that Castillo's statements were not the product of interrogation within the meaning of *Miranda* because the questions were asked to allow the police to perform their administrative duties. The trial court concluded that *Miranda* warnings were not required because the officer's questions were not designed for interrogation purposes "either subjectively or objectively" and that when the questions were asked, the detention was not coercive. Thus, it concluded that Castillo's statements would be admissible at trial.

B. Legal Principles and Standard of Review

A criminal suspect's statements to police during a custodial interrogation will be excluded under *Miranda* if the suspect is not first advised of specific Fifth Amendment rights. (*People v. Thornton* (2007) 41 Cal.4th 391, 432; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 953 (*Whitfield*).) For *Miranda* to apply, the suspect must be in "'custody,'" and the questioning must meet the legal definition of "'interrogation.'" (*Whitfield*, at p. 953.) "The prosecution has the burden of proving that a custodial interrogation did not take place." (*Ibid.*) A trial court's conclusion that *Miranda* warnings were not required is subject to de novo review and its underlying findings

10

regarding custody and interrogation are scrutinized for substantial evidence. (*People v. Clair* (1992) 2 Cal.4th 629, 678.)

"'Interrogation' consists of express questioning, or words or actions on the part of the police that 'are reasonably likely to elicit an incriminating response from the suspect.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 993, quoting *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 (*Innis*).) "'"The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response."'" (*People v. Huggins* (2006) 38 Cal.4th 175, 198.) The determination of whether an action is reasonably likely to elicit an incriminating response focuses primarily on the perceptions of the suspect, rather than the intent of the police. (*Innis*, at p. 301.)

While executing a search warrant on a residence, the police may detain the occupants to prevent flight, minimize the risk of harm to the officers, facilitate orderly completion of the search and determine the relationship of an individual to the premises. (*Michigan v. Summers* (1981) 452 U.S. 692, 702-703, 705 (*Summers*); *People v. Glaser* (1995) 11 Cal.4th 354, 365.) Additionally, an individual that is an occupant of the premises may be detained for the duration of the search. (*Summers*, at p. 705.) As our high court explained, "If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." (*Id.* at pp. 704-705.) Moreover, it is

11

not unreasonable to detain an occupant of the residence in handcuffs for the duration of the search of the residence. (*Muehler v. Mena* (2005) 544 U.S. 93, 98 (*Muehler*).)

C. Analysis

Castillo asserts he was in custody when Officer Thompson asked him if he was responsible for the residence and if everything in it belonged to him. He asserts that both questions were intended to result in incriminating statements. Because these questions were asked prior to *Miranda* warnings, he contends that his statements should have been suppressed. We conclude that the totality of the circumstances show Castillo was not in custody for purposes of *Miranda*. Even assuming the court erred in allowing the evidence, the error was harmless.

Looking at the totality of the circumstances, and applying *Summers* and *Muehler*, the police properly detained Castillo during the entirety of the search. As our high court has stated, "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (*Summers*, *supra*, 452 U.S. at p. 705, fns. omitted.) Searching a suspected drug house is inherently dangerous and the use of handcuffs for the duration of the search prevented flight, minimized the harm to the officers and did not turn a routine detention during execution of a search warrant into an arrest. On these facts, we conclude that Castillo was not in custody when Officer Thompson asked the two questions.

Based on this conclusion, we need not address at length whether the two questions asked by Officer Thompson amounted to interrogation under *Miranda*. Suffice it to say,

12

the trial court here found that the questions were not designed for interrogation purposes and this conclusion was amply supported by the evidence. (*People v. Clair*, *supra*, 2 Cal.4th at p. 678 [trial court's underlying finding regarding interrogation is scrutinized for substantial evidence].) Accordingly, we find no error in the trial court's denial of the motion to suppress.

Even assuming, without deciding, that Castillo's statements should have been excluded, the assumed error was not prejudicial. The admission of incriminatory evidence in violation of *Miranda* requires reversal unless the error was harmless beyond a reasonable doubt. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1166.) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

In making his argument, Castillo focuses exclusively on the prosecutor's closing argument where she reminded the jury of Castillo's statements to the police that the residence and everything in it was his. While these statements are important when viewed in isolation, the statements lose their importance in light of the compelling evidence that Castillo had dominion and control over the residence and its contents.

"The essential elements of possession of a controlled substance are 'dominion and control of the substance in a quantity usable for consumption or sale, with knowledge of its presence and of its restricted dangerous drug character . . . .' " (*People v. Palaschak* (1995) 9 Cal.4th 1236, 1242.) The elements may be established by circumstantial evidence and any reasonable inferences drawn from such evidence. (*Ibid.*) Possession of

13

controlled substances or other contraband includes constructive possession. (*People v. Francis* (1969) 71 Cal.2d 66, 73.) Constructive possession exists when contraband is found in a location subject to the defendant's dominion and control. (*Id.* at pp. 70-71.) As the jury was instructed, possession is established if a person has control or the right to control the item. (CALCRIM No. 2302.) "The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control," like his residence. (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.)

Inside a kitchen drawer, police found two working digital scales that could measure small quantities and plastic bags that could be used to package drugs for sale. One scale contained a white crystal residue that Officer Thompson believed was methamphetamine. Police also found a mechanical scale on the kitchen countertop that could also be used to measure small quantities.

The residence contained two bedrooms. Inside one bedroom, police found an air mattress and a plastic storage container with drawers. On top of the storage container, police found two sets of keys. The police were able to use the keys to open safes located inside another bedroom. Other keys opened one of the doors to the residence.

Inside the storage container, police found a phone bill with Castillo's name on it and a strip of four photographs of Castillo and Obeso. Next to the storage container, police found a pair of men's jeans. A wallet inside the jeans contained cash and Castillo's California identification card. The pockets of the jeans were full of cash separated into different denominations. One pocket contained $420 and another pocket contained $360.

14

The bedroom mostly contained men's items on one side of the bed and inside the closet. On the other side of the bed, there was female clothing inside plastic grocery bags that had been knotted on the top.

The second bedroom contained the two locked fire safes, but no bed or personal belongings. One of the safes contained a digital scale, some wrapping papers and $6,287 cash in small denominations. The second safe contained a semiautomatic handgun and a crystal-like substance that police later determined to be methamphetamine. The methamphetamine had been separated into four packages that weighed a total of 448.2 grams, close to one pound of drugs. This room contained a table that Officer Thompson believed was a workstation as on it were homemade containers, packaging material made out of baggies and tape. Police also found a notebook that they later determined to be a "pay/owe sheet." Officer Thompson described a "pay/owe sheet" as similar to a bank ledger showing a series of names and numbers showing how much a person owes for a specific amount of controlled substance. A trash bin inside the room contained what police believed to be packaging material used to transport controlled substances.

Based upon his inspection of the residence, Officer Thompson believed that only Castillo lived there. Significantly, Castillo asked police to call his mother to secure the residence after police completed the search. After reviewing the circumstances of Castillo's case, a police sergeant familiar with narcotic sales concluded that Castillo possessed the drugs found in the apartment to sell. The sergeant also testified that it is common for drug dealers to keep drugs out of their bedroom to allow them to separate work from their personal life.

15

Separate from Castillo's statements, this evidence established Castillo's dominion and control over the residence and the items inside of it.  Thus, the assumed *Miranda* error was harmless beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.


McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

16