J-S13034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                             :               PENNSYLVANIA
                                               :
                   v.                             :
                                               :
                                               :
JEFFREY AURSBY                        :
                                               :
                 Appellant            :     No. 901 EDA 2020

Appeal from the Judgment of Sentence Entered October 21, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006650-2018

BEFORE: OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:               **FILED JULY 07, 2021**

Jeffrey Aursby (Aursby) appeals from the judgment of sentence of 80 to 160 months' imprisonment entered in the Court of Common Pleas of Montgomery County (trial court) after a jury found him guilty of persons not to possess a firearm and unlawful possession of a controlled substance.[1] On appeal, he challenges (1) the denial of his motion to suppress, and (2) the sufficiency of the evidence for his convictions. After review, we affirm.

**I.**

On August 4, 2018, around 12:00 p.m., Officer Jeff Calabrese and his partner were transporting a prisoner when they came upon a car stopped in

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 6105(a)(1) and 35 P.S. § 780-113(a)(16).

the middle of the road and causing a backup. Officer Calabrese stopped and got out to see if the driver needed help. When he looked inside, he saw Aursby asleep in the driver's seat; he was the car's only occupant. Officer Calabrese knocked on the window but could not wake him up. Officer Calabrese also detected an "overwhelming" aroma of fresh marijuana coming from the car. Officer Calabrese walked back and told his partner about what he saw. Because they needed to leave, the partner radioed for more units. Officer Calabrese and his partner then went back and "pounded" on the window. This time, Aursby woke up. When he did, Officer Calabrese asked him to turn off the car and hand him his keys. Aursby complied.

Officers Michael Young and Alexander Pratt arrived less than ten minutes later to take over the scene. Officer Young tried to speak with Aursby, but he had fallen back asleep. When Aursby woke up, he looked at Officer Young with a "blank stare" and did not appear aware of his surroundings, as he continued to fall back asleep. When he would respond, he made "unintelligible mumblings." During this time, Officer Young smelled an aroma of fresh marijuana coming from the car. He also noticed several air fresheners in the interior, some of which were hanging from the ceiling behind the driver's side. There was also a burnt air freshener in the CD player; when asked about it, Aursby said that he burnt it to put out more of an aroma like an incense. Finally, Officer Young also smelled the odor of cigars coming from the car.

Based on his observations, Officer Young suspected that Aursby was under the influence of marijuana or a controlled substance causing him to radio for an officer certified in Advanced Roadside Impaired Driving Enforcement (ARIDE), which involves field sobriety testing of drivers under the influence of drugs instead of alcohol. The only ARIDE-certified officer available that day was Officer Eric Fries. At the time, however, Officer Fries was at the other end of the township on another traffic stop. Officer Young had to wait for Officer Fries to become available. In the meantime, Aursby waited in his car while the officers stood around and talked to him. While they were waiting, Officer Pratt saw Aursby glance back to the rear passenger side area of his car about "half a dozen, ten times."

As soon as he was available, Officer Fries drove directly to Officer Young's location. He arrived around 12:53 p.m., about 40 minutes after Officer Young called for his assistance. As he approached the car, Officer Fries smelled the odor of fresh marijuana coming from the car. Like Officer Young, he noticed the many air fresheners in the car's interior but also that there was a cigar in the center ashtray. After introducing himself, Officer Fries asked Aursby to exit the car. After Aursby got out, Officer Fries asked him when was the last time that he smoked marijuana; he replied around 1:00 a.m. that morning. He also explained that he worked all night at a 7-Eleven and that was why he was so tired. Aursby then agreed to take the field sobriety tests

and walked with Officer Fries to a nearby area to take the tests. At the end of the testing, Officer Fries found no evidence that Aursby was impaired.

Officer Fries, however, still wanted to search the car, telling Aursby that he could consent to the search or the officers would impound the car and apply for a search warrant. Officer Fries added that if he found only a small amount of marijuana or paraphernalia, he would not criminally charge Aursby with anything. Aursby consented.

Officer Fries and another officer searched the front of the car first. Officer Fries found marijuana "roaches" inside an ashtray while the other officer found a digital scale in the glove compartment. Officer Fries then checked under the driver's seat and found a plastic bag, at which point Aursby said, "y'all not checking the back." Upon hearing this, Officer Fries stopped the search and walked back to Aursby. After Officer Fries explained consent searches, Aursby told him that he would need to apply for a search warrant. Officer Fries then had the car towed to an impound lot.

The next day, Officer Fries searched the car after obtaining a warrant. He first searched the plastic bag under the driver's seat and found a baggie containing a substance appearing to be cocaine. He also found Aursby's identification card and several car parts that Aursby had said he was delivering for his job. In the rear of the car, Officer Fries found a bag of men's clothes on the floor of the passenger's side rear. After moving the clothes, he opened the floorboard compartment and discovered a loaded Smith & Wesson .22

revolver. Aursby was charged with persons not to possess a firearm along with unlawful possession of a controlled substance (cocaine).

Before trial, Aursby moved to suppress the firearm and cocaine. At the suppression hearing, Aursby asserted two bases for suppression. First, Aursby asserted that the police subjected him to the functional equivalent of an arrest when he was forced to wait over 40 minutes for Officer Fries to perform the field sobriety tests. Because there was no probable cause to arrest at that point, he argued that he was unlawfully seized. In response, the Commonwealth asserted that the delay for the field sobriety testing was excusable because Officer Fries was the only ARIDE-certified officer on duty that day and was at the other end of the township at the time of the call.

Second, Aursby asserted that his consent to the warrantless search of the car was involuntary because it was coerced by the police. The Commonwealth countered that Aursby's consent was voluntary, but added that the police could search the car under the automobile exception to the warrant requirement adopted in **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014) (plurality). In **Gary**, a plurality of the Pennsylvania Supreme Court held that police may conduct a warrantless search of a stopped vehicle if they have probable cause to do so, regardless of any exigency beyond the vehicle's inherent mobility.

After the hearing, the trial court denied Aursby's motion to suppress. In its conclusions of law, the trial court rejected his contention that he underwent

an arrest, finding instead that his encounter with the police was an investigative detention. In so finding, the trial court noted that the police found Aursby passed out in his car in the middle of a busy road; Aursby could not stay awake; multiple officers smelled the odor of marijuana; and Aursby had several air fresheners. For these reasons, the trial court found, the police had reasonable suspicion that Aursby was both driving under the influence and in possession of illegal narcotics. As to Aursby's second argument on consent, the trial court did not address the issue, instead finding that the police had probable cause to search Aursby's car for contraband.

Aursby proceeded to a one-day jury trial that ended with the jury finding him guilty of persons to not to possess firearms and possession of a controlled substance. The trial court sentenced him to serve 80 to 160 months' imprisonment for the firearms and a concurrent 6 to 12 months for the drug offense. After the denial of a post-sentence motion, he filed this appeal to raise two issues:

> 1. Did the suppression court err in denying Mr. Aursby's motion to suppress when [he] was subject to the functional equivalent of a custodial arrest, there was no probable cause to justify such a detention, and [his] consent to search the vehicle was invalid, thereby violating his Fourth Amendment rights?

> 2. Was the evidence insufficient as a matter of law for the trial court to convict Mr. Aursby of 18 Pa.C.S. § 6105(a)(1), person not to possess a firearm, when there was insufficient evidence that [he] "possess[ed], use[d], control[ed], transfer[ed] or manufacture[d]" a firearm, and of 35 P.S. § 780-113(a)(16), possession of a controlled substance, when there was insufficient evidence that [he] "knowingly or intentionally possess[ed] a controlled or counterfeit substance" on August 4, 2018?

Aursby's Brief at 3-4.

## II.

Aursby first challenges the denial of his motion to suppress the cocaine and firearm, reasserting the two arguments that he made at the suppression hearing:  (1) that he underwent an arrest without probable cause waiting for Officer Fries; and (2) his consent was involuntary.[2]

_____

[2] We review the denial of a suppression motion mindful of the following:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.  Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.  The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.  Thus, the conclusions of law of the courts below are subject to our plenary review.

> Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

**_Commonwealth v. Harlan_**, 208 A.3d 497, 499-500 (Pa. Super. 2019) (citation omitted).

**A.**

We must first determine whether the police subjected Aursby to an investigative detention or an arrest while waiting for Officer Fries.

> The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) a custodial detention. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005).

> "A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond," *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super. 2000) (internal citations and quotations omitted), and therefore need not be justified by any level of police suspicion. *Commonwealth v. Polo*, 563 Pa. 218, 759 A.2d 372, 375 ([Pa.] 2000).

> "In contrast, an 'investigative detention' ... carries an official compulsion to stop and respond.... Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." *DeHart*, 745 A.2d at 636.

> \*\*\*

> Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." [*Id.*] This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Mackey*, 177 A.3d 221, 227 (Pa. Super. 2017).

Aursby asserts that he first faced an investigative detention when Officer Calabrese asked for his car keys. That detention, he contends, transformed

into an arrest when he was forced to wait in his car for Officer Fries while being surrounded by several police officers and cars.

We addressed a similar claim in **Commonwealth v. Freeman**, 150 A.3d 32 (Pa. Super. 2016). In that case, a trooper pulled over a car for unsafe lane changes at 11:26 a.m. The trooper issued a written warning at 11:52 a.m. but believed that the driver was transporting drugs, causing the trooper to request a K-9 unit to come to the vehicle. According to the trooper, about "an hour, hour and fifteen minutes elapsed" from the beginning of the traffic stop to the K-9 search. Addressing the driver's argument that the length of the stop rendered it unreasonable, we first reviewed the law on the length of an investigative detention.

> The United States Supreme Court has explained:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. **See Michigan v. Summers**, [452 U.S. 692, 701 n.14, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)] (quoting 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978)); **see also** [**U.S. v. Place**, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)]; [**Florida v. Royer**, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. .... A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." **Cady v. Dombrowski**, 413 U.S. 433, 447,

93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *see also United States v. Martinez–Fuerte*, 428 U.S. 543, 557, n. 12, 96 S.Ct. 3074, 3082, n. 12, 49 L.Ed.2d 1116 (1976).  The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*United States v. Sharpe*, 470 U.S. 675, 686–687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

*Freeman*, 150 A.3d at 43-44.

Applying these principles, we found that the police diligently pursued its investigation.

… [T]the record before us shows that, under the circumstances, the troopers acted reasonably and diligently in pursuing their suspicions during the one-hour-plus time frame.  The vehicle was stopped in a rural area of the Commonwealth.  In the first half hour after the stop, [the trooper] had Appellant move his car to a safer location and then questioned Appellant and notified him of the traffic violation.  [The trooper] then called for backup and a canine unit.  Once the dog arrived, the search was conducted quickly.  There is no evidence that the detention was delayed for any improper reason.  It stands to reason that dispatching a canine unit to a rural location will likely take longer than doing so in an urban area.  We therefore hold that the duration of the detention was not unreasonable.

*Id*. at 44.

We conclude the same here.  The relevant inquiry is whether the police "acted reasonably and diligently" in their investigation.  Like *Freeman*, there is no evidence that the detention was delayed for any improper reason.  Officer Calabrese found Aursby's car blocking traffic around 12:00 p.m.  Officer Calabrese, however, could stay only a short time because he and his partner were transporting a prisoner and Officer Young took over the scene at 12:10

- 10 -

p.m. Not long after, Officer Young determined that Aursby might be impaired based on all his observations and needed an officer certified in specialized field sobriety. At the time, though, there was only one officer able to perform such testing, Officer Fries, and he was at the other end of the township and busy finishing another traffic stop. At the suppression hearing, Officer Fries testified that he drove directly to Officer Young's location as soon as he completed the traffic stop. N.T., 4/22/19, at 32.

When he arrived around 12:53 p.m., about 53 minutes had elapsed from when Officer Calabrese first found the car, and about 40 minutes had elapsed from when Officer Young had called for the specialized field sobriety testing. Both are shorter delays than the one we found reasonable in **Freeman**. Nor is there any evidence that the police delayed their investigation or unnecessarily prolonged the duration of the detention. Any delay that occurred resulted from Officer Fries being the only officer available who was certified to perform the field sobriety testing and not being readily available to do so. Given those circumstance, the duration of detention was not unreasonable, and because the delay was not unreasonable, Aursby's investigative detention was never transformed into an arrest requiring probable cause.

**B.**

Next, Aursby argues that the warrantless search of his car was illegal because the police coerced his consent. The trial court did not address consent

but instead held that the warrantless search of the car was permissible under the automobile exception adopted by our Supreme Court in *Gary*. While this case was pending on appeal, though, our Supreme Court, in *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020), overruled *Gary*, holding that warrantless vehicle searches require both probable cause and exigent circumstances under Article I, Section 8 of the Pennsylvania Constitution. *See id*. at 208 (stating the "long history of Article I, Section 8 and its heightened privacy protections do not permit us to carry forward a bright-line rule that gives short shrift to citizens' privacy rights."). Before we can address Aursby's consent argument then, we must first determine whether *Alexander* applies to this case, since the trial court held that the warrantless search of the car was allowed under the automobile exception.

The Commonwealth asserts that Aursby cannot avail himself of *Alexander* because he has waived any state constitutional claim pertaining to the warrantless search. In support, the Commonwealth cites our recent decision in *Commonwealth v. Grooms*, 247 A.3d 31 (Pa. Super., filed February 24, 2021). There, we were faced with a similar scenario where the trial court denied a suppression motion by finding that the police had probable cause to search a car without a warrant. *Id*. at 35. During the appeal, however, the Supreme Court decided *Alexander*. In a footnote, we explained the law on the retroactive application of a new criminal rule:

> When a United States Supreme Court decision "results in a 'new rule,' that rule applies to all criminal cases still pending on direct

- 12 -

review." ***Schriro v. Summerlin***, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (citing ***Griffith v. Kentucky***, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).  "Case law is clear, however, that in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at 'all stages of adjudication up to and including the direct appeal.' " ***Commonwealth v. Tilley***, 566 Pa. 312, 780 A.2d 649, 652 (2001) (citation omitted); ***see also Commonwealth v. Newman***, 99 A.3d 86, 90 (Pa. Super. 2014) (*en banc*) ("To be entitled to retroactive application of a new constitutional rule, a defendant must have raised and preserved the issue in the court below."), ***appeal denied***, 632 Pa. 693, 121 A.3d 496 (2015).

***Grooms***, 247 A.3d at 37 n.6.  Based on this, we held that the appellant could not rely on ***Alexander*** to challenge the warrantless search because he never challenged the application of the ***Gary*** automobile exception.  ***Id***.

We find the same here, as Aursby has failed to raise and preserve the issue.  In his Pa.R.A.P. 1925(b) statement, Aursby limited his suppression challenge to the Fourth Amendment, asserting only that his "Fourth Amendment rights were violated."  Concise Statement, 6/11/2020, at 1.  He does the same on appeal, limiting his argument to the Fourth Amendment in asserting that his consent was involuntary.  Moreover, Aursby did not challenge the trial court's application of the ***Gary*** automobile exception in his Pa.R.A.P. 1925 statement, nor does he attempt to do so in this appeal.[3]  Like

---

[3] Though Aursby filed his brief before ***Alexander***, the Commonwealth's brief was filed after it was decided and cited the decision.  Despite this, Aursby did not file a reply brief or post-submission communications asking this Court to argue that ***Alexander*** is applicable to this case.

- 13 -

the defendant **Grooms**, because Aursby has not preserved this issue, we cannot apply **Alexander** to this case.

Having found **Alexander** inapplicable, we next determine whether the trial court erred in holding that the consent was immaterial because the police had probable cause to search Aursby's car without a warrant. A warrantless search of a vehicle must be supported by probable cause. **Commonwealth v. Scott**, 210 A.3d 359, 363 (Pa. Super. 2019). This Court has stated:

> [A] determination of probable cause requires only that the totality of the circumstances demonstrates a fair probability that contraband or evidence of a crime will be found in a particular place. ... [T]he evidence required to establish probable cause for a warrantless search must be more than a mere suspicion or a good faith belief on the part of the police officer.

**Id**. (citations and quotation marks omitted).

The trial court explained its probable cause determination in its Pa.R.A.P. 1925(a) opinion as follows:

> Authorities encountered [Aursby] passed out in his vehicle in the middle of a busy roadway and [Aursby] could not remain awake when he spoke with authorities. Multiple officers credibly testified that [Aursby's] vehicle had a distinct odor or marijuana and there were several air fresheners inside the vehicle which the officers testified were consistent with an attempt to conceal drugs. Therefore, these factors provided the officers with sufficient facts demonstrating that contraband would be found within the vehicle and provided authorities with probable cause to search the vehicle.

Trial Court Opinion, 9/8/20, at 7-8.

Based on the totality of the circumstances, we conclude the suppression court properly determined that the police had probable cause to believe that

- 14 -

there was "a fair probability" that contraband or evidence would be in found in Aursby's car. First, this is not a case involving a warrantless search based solely on the police officer smelling marijuana. Instead, besides the three police officers detecting the smell of "fresh marijuana," Officers Young and Fries testified that Aursby had several air fresheners in his car. Officer Young testified that, based on his 24 years' experience and training, the presence of numerous air fresheners in a car often indicates the presence of marijuana, as does the strong odor of cigars. **See** N.T., 4/22/19, at 16. Moreover, Aursby admitted to Officer Fries that he smoked marijuana earlier that morning, *albeit* around 1:00 a.m. *Id*. at 34. Even if the field sobriety tests dispelled that Aursby was impaired, there remained sufficient circumstances for the police to conclude that there was contraband in Aursby's car based on (1) the smell of marijuana, (2) the presence of the air fresheners and cigar odor as masking agents, and (3) his admission that he had smoked marijuana earlier. Accordingly, we discern no error in the trial court's determination that the police did not violate Aursby's Fourth Amendment rights by searching his car without a warrant.[4]

---

[4] We may affirm a suppression court's order "on any valid basis appearing of record." **In re N.B.**, 187 A.3d 941, 945 (Pa. Super. 2018).

## III.

In his second issue, Aursby challenges the sufficiency of evidence for both of his convictions, arguing that the Commonwealth presented insufficient evidence that he constructively possessed either the revolver or the cocaine.[5]

## A.

We first consider whether there was sufficient evidence to convict for persons not to possess a firearm. Section 6105(a)(1) of the Crimes Code states that:

> [a] person who has been convicted of an offense enumerated in subsection (b) ... shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

_____

[5] For a sufficiency claim, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Palmer***, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted and formatting altered).

- 16 -

18 Pa.C.S. § 6105(a)(1).[6]

"Possession" is defined as:

**(c) Possession as an act.**-Possession is an act, within the meaning of this section, if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

18 Pa.C.S. § 301(c).

Illegal possession of a firearm may be established by constructive possession. ***Commonwealth v. Parker***, 847 A.2d 745, 750 (Pa. Super. 2004). This Court has explained constructive possession:

When contraband is not found on the defendant's person, the Commonwealth must establish "constructive possession," that is, the power to control the contraband and the intent to exercise that control. The fact that another person may also have control and access does not eliminate the defendant's constructive possession .... As with any other element of a crime, constructive possession may be proven by circumstantial evidence. The requisite knowledge and intent may be inferred from the totality of the circumstances.

***Commonwealth v. McClellan***, 178 A.3d 874, 878 (Pa. Super. 2018) (citations omitted). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not." ***Id***.

Before addressing Aursby's argument, we add these facts from his jury trial. First, as noted above, Officer Pratt saw Aursby glance toward the rear compartment, the implication being that he knew the revolver was there. At

---

[6] Aursby does not dispute that he is disqualified from possessing a firearm.

trial, however, Officer Pratt admitted that he did not include what he saw in his initial report.  *See* N.T., 7/30/19, at 109.  Second, besides the revolver, Officer Fries found several other items in the rear compartment, including a purse and an access card for a woman named "Keeshama Hunter."  *Id*. at 135.  The police tried to locate this woman but failed.  *Id*. at 154.  Finally, after securing the firearm, the police did not submit it for any forensic testing.  *Id*. at 148.

Aursby asserts that the only evidence tying him to the revolver was his presence in the car, equating himself to someone merely in proximity to contraband.  He notes that he never reached for the revolver, nor was it within his reach.  He also minimizes the significance of Officer Pratt seeing him glance to the rear compartment, pointing out that the officer failed to include the information in his report.  As to the contents of the compartment, Aursby asserts that it is just as likely that the revolver belonged to a woman—if not "Keeshama Hunter" herself.  Similarly, he notes that he was not the sole owner of the car, as it was registered to both him and his mother.  Finally, he faults the police for not submitting the revolver for forensic testing, arguing that if they had done so they would have easily confirmed whether he possessed the firearm.

Viewed in the light most favorable to the Commonwealth as the verdict winner, we do not agree with his characterization of himself as someone merely in proximity to the firearm because the evidence was sufficient to

establish that Aursby constructively possessed the revolver. First, he was the co-owner and sole occupant of the car. The police also found not only his identification in the car, but also several automobile parts that he admitted he was delivering as part of his job. Along with the bag of men's clothes found in the back, the jury could infer that the car was Aursby's car that he used day-to-day as part of his work. That Aursby's mother was registered as a co-owner of the car does little to detract from this conclusion.

Officer Pratt's observation also supported the inference that Aursby knew that the revolver was in the rear. As noted above, Aursby asserts that this evidence lacks credibility because Officer Pratt waited until trial to disclose what he saw. At trial, however, the Commonwealth clarified that Officer Pratt wrote his report before Officer Fries found the revolver the next day. **See** N.T., 7/30/19, at 112-13. The significance of Aursby's behavior then may not have been apparent to Officer Pratt at the time of his observation.

Finally, the jury was free to take all this into consideration in determining whether Aursby's behavior evidenced that he acknowledged that the revolver was in the rear compartment.

The same is true of the police not finding Keeshama Hunter or submitting the revolver for forensic testing. While either may have helped the jury in its determination of constructive possession, neither was required for the Commonwealth to establish that Aursby was aware of and had control over the revolver. Instead, it was sufficient that Aursby was the sole occupant

of a car that he co-owned; that the revolver was found inside the car; and that Aursby continually glanced at the revolver's location while waiting to take field sobriety tests. Based on these facts, the jury had sufficient evidence to find that Aursby constructively possessed the revolver and, therefore, convict him of persons not to possess a firearm. *See Commonwealth v. Cruz*, 21 A.3d 1247, 1253 (Pa. Super. 2011) (finding sufficient evidence to convict for illegal possession of firearm where defendant was only person in car in which firearms was found in passenger side compartment and police saw him move toward compartment when he realized he was being pulled over for a traffic stop).

**B.**

For the same reasons, we conclude that there was sufficient evidence to convict Aursby of unlawful possession of a controlled substance. To prove that offense, the Commonwealth must prove that the defendant "[k]nowingly or intentionally possess[ed] a controlled or counterfeit substance" and that he was "a person not registered under this act." 35 P.S. § 780-113(a)(16). Like Section 6105, the Commonwealth may prove possession by showing actual, constructive or joint constructive possession. *Commonwealth v. Vargas*, 108 A.3d 858, 868 (Pa. Super. 2014) (*en banc*).

As reviewed above, Aursby was the sole occupant of a car that he co-owned. The police found items showing that he used the car day-to-day: his identification, automobile parts that he was delivering for his job, and a bag

- 20 -

of men's clothing in the back. This evidence dispelled any notion that someone else put the contraband under the driver's seat. Viewing the evidence in the light most favorable to the Commonwealth, the jury could reasonably conclude that Aursby had the ability and intent to exercise control over the cocaine found under the driver's seat. ***See Commonwealth v. Dix***, 207 A.3d 383, 390-391 (Pa. Super. 2019) (evidence sufficient to find constructive possession of drugs where defendant was driver of car and police found drugs on floor in front of driver's seat). Accordingly, there was sufficient evidence to support his conviction for unlawful possession of a controlled substance.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/7/2021*